[No. F006430. Fifth Dist., Jan. 11, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
LEO REYES MARTINEZ, Defendant and Appellant.

## COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Harvey R. Zall, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, James T. McNally, Paul V. Bishop, George C. Spanos and Janet G. Bangle, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BALLANTYNE, J.**—Defendant was convicted by jury of 20 counts of lewd and lascivious acts with a child under 14 years of age (Pen. Code, § 288, subd. (a)).[1] The jury found true the special allegations as to each count that defendant had occupied a position of special trust with respect to the victim and committed acts of substantial sexual conduct. (§ 1203.066, subd. (a)(9).) After the trial court appointed three psychiatrists to examine defendant and conducted a hearing on their reports, the court denied defendant's application for probation and sentenced him to prison for 34 years.

Defendant filed a timely notice of appeal.

### THE FACTS

At the time of trial the victim, Linda C., was 18 years old. While growing up, Linda had lived in Sonora with her mother, defendant (whom she

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

referred to as "Dad"), and her older brother after he came to live with the family when he was in sixth or seventh grade. During the summer months of 1978, Linda lived with her mother and defendant in defendant's house. She found out defendant was not her real father when she was 10 or 11 years old but continued to relate to him as if he were, i.e., she related to defendant as she always had. Linda and her mother moved out of defendant's house in the fall of 1978, but by December they were living a few houses away from defendant on the same street. Linda, her mother and her brother moved to Jamestown in 1980 or 1981.

Linda testified defendant molested her during the summer of 1978. The acts of molestation occurred in her bedroom or his, or in the living room; they happened day or night when she was alone with defendant. During the acts that occurred within this period Linda was completely undressed, and defendant caressed her breasts with his hands and his mouth and licked her vagina. Sometimes defendant showed her Playboy or Penthouse magazines with pictures of women undressed or pictures of men and women engaged in sexual activity. Defendant told Linda these pictures would help her to understand things later. Defendant occasionally acted out the pictures with Linda, touching her vagina and her anus with his penis but apparently not achieving penetration. Sometimes defendant forced Linda to masturbate him and sometimes he got on top of Linda and rubbed against her legs until he ejaculated. "It would happen mostly every day." Linda never told defendant she didn't like this activity because "it happened such a long time, I didn't know it was wrong."

Linda did ultimately tell her mother about these activities, and her mother initiated a family discussion at which Linda recanted her accusation because she was afraid. Defendant had told Linda that her mother would not believe her anyway. Defendant told Linda the same thing every time she said she was going to tell someone. At age 14 Linda asked a 13-year-old girlfriend if defendant's behavior toward her was natural, and her friend told Linda it was not. Linda testified defendant tried to prevent her from having any friends. Linda ultimately talked with defendant's eldest daughter from a prior marriage.

After Linda's mother and defendant separated, the acts of molestation continued when Linda went to defendant's house to visit or to clean, to accompany defendant to "see the horses" (defendant had worked as a horse trainer), and "for boxing." Defendant had coached Linda in the art of boxing since she was about 11 years old; her boxing lessons occurred two to three times a week. When defendant molested Linda on these occasions, the activities were the same as those that had occurred while Linda and her mother were living with defendant except Linda refused to undress

completely and insisted on keeping her panties on after she started her menstrual periods at age 12.

Sometime after talking to her friend, Linda told her private tutor of the molestation and ultimately told some women from the family respite program, a group offering parenting classes that Linda attended after she had had a child at about age 16. Another woman in the group related an incident of molestation, and when Linda appeared to be nodding in agreement, a third member of the group asked Linda if something like that had happened to her. After Linda told her story to the group, "they had to report it."

Defendant's molestation of Linda finally came to an end when Linda's mother got a restraining order against defendant. Between June 1978 and December 1979 there was never a month in which Linda did not get molested by defendant, and she was molested at least once in January 1980. Then it "kind of stopped." Defendant bought Linda presents, such as dolls, etc., to "reward" her when she had been molested and to gain her silence.

Sophie M., Linda's mother, had once been married to defendant and the three lived together as a family until Sophie and defendant separated in 1978. During the relevant time period, June 1978 to January 1980, Sophie suspected that Linda was being molested by defendant and once saw them in defendant's house. Defendant had taken Linda over to his house but was "taking too long to come back," so Sophie went to get her daughter. Sophie knocked on the door and through a window saw defendant and Linda. Linda was undressed and lying on the sofa, and defendant was naked from the waist down. Defendant covered himself with a towel and pushed Linda out of the room but refused to answer Sophie's knock. Sophie did not report this incident to the police because she did not think she could make herself understood. Linda appeared to be sad after spending time with defendant and she was sad and nervous in school.

Defendant took the stand in his own behalf and denied ever molesting Linda. Defendant admitted he paid Linda to clean his house and that he took Linda horseback riding and on drives to Modesto but stated he did not molest her on any of those occasions. Defendant testified he and Linda were friends. He acknowledged on cross-examination that he had participated in the youth boxing program with Linda until 1979.

### Discussion

#### I.

As defendant points out in his opening brief, a strictly mathematical analysis of Linda's testimony suggests in excess of 200 separate acts of

molestation occurring over a period of 32 months. Defendant was charged and convicted of 20 counts of lewd and lascivious conduct (§ 288, subd. (a)); both the information as amended and the verdict forms returned by the jury establish that the first 19 counts covered sequential monthly time frames, beginning with the period of June 1, 1978, to June 30, 1978, (count I), and continuing through the period of December 1, 1979, to December 31, 1979, (count XIX). Count XX covered the 13-month time frame between January 1, 1980, and February 1, 1981. ■ Defendant now contends the trial court's failure to instruct the jury, sua sponte, that they must unanimously agree on which of the numerous acts testified to by the victim constituted the basis for their guilty verdict on each of the 20 counts with which defendant was charged was prejudicial error that requires reversal. We agree.

■ Where the accusatory pleading charges a single criminal offense and the evidence shows more than one such unlawful act was committed, *either* the prosecution must elect the specific act relied upon to prove the charge *or* the jury must be instructed substantially in the words of CALJIC Nos. 17.01 or 4.71.5[2] that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act. (*People v. Diedrich* (1982) 31 Cal.3d 263, 280-282 [182 Cal.Rptr. 354, 643 P.2d 971]; *People v. Gordon* (1985) 165 Cal.App.3d 839, 853 [212 Cal.Rptr. 174]; *People v. Metheney* (1984) 154 Cal.App.3d 555, 560-563 [201 Cal.Rptr. 281].) ■ Since the duty to instruct with CALJIC No. 17.01 in an appropriate case is a sua sponte one, a defendant's failure to request the instruction does not constitute a waiver of appellate review. (*People v. Madden* (1981) 116 Cal.App.3d 212, 219 [171 Cal.Rptr. 897].)

The well-established fundamental principle that the jury must unanimously agree on the act or acts a defendant is convicted of is not of recent origin and is well developed by decisional law in California. The genesis of the doctrine of election is found in two vintage decisions of the California Supreme Court, *People v. Castro* (1901) 133 Cal. 11 [65 P. 13] and *People v.*

---

[2] CALJIC No. 17.01 provides: "The defendant is charged with the offense of _____ . He may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of such acts, but in order to find the defendant guilty, all the jurors must agree that he committed the same act or acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

CALJIC No. 4.71.5 provides: "Defendant is charged in [Count _____ of] the information with the commission of the crime of _____ , a violation of section _____ of the Penal Code, on or about a period of time between _____ and _____ . [¶] In order to find the defendant guilty, it is necessary for the prosecution to prove beyond a reasonable doubt the commission of a specific act [or acts] constituting said crime within the period alleged. [¶] And, in order to find the defendant guilty, you must unanimously agree upon the commission of the same specific act [or acts] constituting said crime within the period alleged. [¶] It is not neccesary that the particular act or acts committed so agreed upon be stated in the verdict."

*Wlliams* (1901) 133 Cal. 165 [65 P. 323]. In *Castro,* defendant was convicted of rape alleged to have been committed on June 30, 1899. The victim testified to four specific acts of sexual intercourse occurring over a period of several months. In reversing the conviction, the Supreme Court stated: "Under the *instructions* given to the jury in the case at bar, the defendant should have been convicted, if any one of the various acts of intercourse sworn to by the prosecutrix was established beyond a reasonable doubt; but, certainly, the defendant was not called upon to defend himself against all of these respective acts of intercourse, extending through a period of several months. The information only charged one act, and upon that allegation the case must stand or fall. Possibly, any one of the acts sworn to by the prosecutrix could have been selected by the state as the act charged in the pleading, but the entire four acts could not be so selected. The state, at the commencement of the trial, should have been required to select the particular act upon which it relied to make good the allegation of the information. This was not done; and even conceding that the failure to make such election at that time did not constitute error because of the want of demand upon the part of the defendant to make the election, still, when the case went to the jury, the court, in some form, should have directed their minds to the particular act of intercourse which it was incumbent upon the state to establish by the evidence, before a verdict of guilty could be returned against the defendant. This was not done." (*People* v. *Castro, supra,* 133 Cal. at pp. 12-13.)

In *Williams,* defendant was convicted of rape of a 13-year-old child. The victim testified that she lived with the defendant for four months during which defendant had sexual intercourse with her almost every day and sometimes five or six times a day. The jury was instructed that if they found defendant had had sexual intercourse with the victim at any time within three years of the indictment, then it should find defendant guilty. In reversing the conviction, the Supreme Court stated: "Each of these acts was a separate offense, and the defendant could be tried for either, and separately for each of them. The jury were not even told that they must all agree that some specifically described act had been performed. A verdict of guilty could have been rendered under such an instruction, although no two jurors were convinced beyond a reasonable doubt, or at all, of the truth of the charge, as to any one of these separate offenses. Even worse than that was possible. As to every specific offense which there was an attempt to prove, and which could be met by proof, the defendant may have established his defense, and yet upon the general evidence of continuous crime, which, in the nature of things, he could only meet by his personal denial, he may have been convicted. And how could he defend when he was not informed as to what particular offense, out of hundreds testified to by the prosecutrix, he was to be tried? Such a trial, upon a charge so indefinite as to circumstance

of time or place, or any particular, except by the general designation, would be a judicial farce, if it were not something a great deal worse." (*People* v. *Williams, supra,* 133 Cal. at p. 168.) (See also *People* v. *Alva* (1979) 90 Cal.App.3d 418, 424-426 [153 Cal.Rptr. 644] [multiple unlawful sex acts over a five-month period]; *People* v. *Gavin* (1971) 21 Cal.App.3d 408, 418-420 [98 Cal.Rptr. 518] [possession of narcotics]; *People* v. *Dutra* (1946) 75 Cal.App.2d 311, 321-322 [171 P.2d 41] [contributing to the delinquency of a minor where there are several acts of sex perversion]; *People* v. *Ruiz* (1920) 48 Cal.App. 693, 694-696 [192 P. 327] [several acts within an hour of assault with intent to commit rape].)

The facts in the *Alva* case are very similar to the facts in the matter at hand. In *Alva,* the father had multiple acts of sexual intercourse with his 12-year-old daughter over a five-month period. He was charged in three separate counts with incest, unlawful sexual intercourse, and lewd and lascivious acts upon a child, each act occurring during the five-month period. As in the instant case, the People did not make an election nor did the court give an appropriate instruction indicating that the jury must be in unanimous agreement that the defendant had committed the same act in order to find him guilty. The Court of Appeal, in reversing, held that the trial court's failure to instruct the jury as to the manner in which to approach its task when faced with proof of continuous criminal conduct when only one act occurring within a five-month time period was charged in each count was reversible error.

■ The respondent argues that, "In a case where a defendant is charged with an unlawful continuous course of conduct such as contributing to the delinquency of a minor or child abuse, such an instruction is not appropriate." (Citing *People* v. *Diedrich, supra,* 31 Cal.3d 263, at p. 282 and *People* v. *Ewing* (1977) 72 Cal.App.3d 714, at p. 717 [140 Cal.Rptr. 299].) We are not persuaded. First of all, the crime charged herein, lewd and lascivious acts with a child, was not listed as coming within the ambit of the "continuous crime" exception in either the *Diedrich* or *Ewing* cases.

Furthermore, in *People* v. *Madden, supra,* 116 Cal.App.3d 212, this court recently dealt with the course-of-conduct argument as it related to multiple sexual acts as follows: "Insofar as cases cited herein might be read as holding that multiple sex offenses constitute a continuous course of conduct or a single act, we disagree. Multiple sex acts cannot be held to be continuous conduct on a theory of there being but one act of sexual abuse. In *People* v. *Perez* (1979) 23 Cal.3d 545 . . ., the defendant committed numerous sexual offenses upon a single victim during an uninterrupted period of some 45-60 minutes. Our Supreme Court held that the defendant could be convicted and punished for each separate act/offense. [Citations.] So also in the

instant case. Each appellant here could have been (and Madden in fact was) charged with several sexual offenses. The problem is that insofar as the charges of oral copulation are concerned, the jury was not told all of the jurors had to agree on a specific act." (*Id.* at p. 218, fn. omitted.)

We are not unmindful of the severe problems that confront law enforcement and prosecutors in obtaining from these young victims the specifics necessary to prove a particular offense and which fuels their desire to have this type of crime considered a course-of-conduct sexual offense. This is not a sufficient justification for discarding these basic constitutional protections for those accused of crime. Such a departure from long-established policy we feel compelled to leave to our high court or our Legislature to address.

We conclude that the failure of the court to compel an election by the prosecution as to which specific act they were proceeding on in each count or to instruct the jury as to the manner in which it should approach its task when faced with proof of continuous criminal conduct was prejudicial error and requires reversal of the judgment. For the guidance of the trial court, in the event of a retrial in this matter, we will discuss the additional contention raised by the defendant.

## II.

Each of the 20 counts charging defendant with lewd and lascivious conduct also alleged he had occupied a position of special trust with respect to the victim, specifically a stepparent, and had committed an act of substantial sexual conduct within the meaning of section 1203.066, subdivision (a)(9). The jury found each of these special allegations true. Thus, according to the specific provisions of section 1203.066, defendant was rendered statutorily ineligible for probation unless the trial court made four specific findings.

Section 1203.066 was added by Statutes of 1981, chapter 1064, section 4, effective January 1, 1982; the latest occurrences of molestation alleged in the information occurred in January 1980, some two years prior to the effective date of the statute. Although the trial court proceeded in accordance with the terms of the statute in conducting a hearing on psychiatrists' reports, the court found itself unable to make all four of the findings required to avoid ineligibility for probation under that statutory provision. ▮▮▮ Defendant now contends application of this section to his case violated the constitutional proscription against ex post facto laws. (U.S. Const., art. I, § 10, cl. 1, and Cal. Const., art. I, § 9.)

The pertinent provisions of section 1203.066 are as follows: "(a) Notwithstanding Section 1203, probation shall not be granted to, nor

shall the execution or imposition of sentence be suspended for, nor shall a finding bringing the defendant within the provisions of this section be stricken pursuant to Section 1385 for, any of the following persons:

"· · · · · · · · · · · · · · · · · · · ·

"(9) A person who occupies a position of special trust and commits an act of substantial sexual conduct. 'Position of special trust' means that position occupied by a person in a position of authority who by reason of that position is able to exercise undue influence over the victim. Position of authority includes, but is not limited to, the position occupied by a natural parent, adoptive parent, stepparent, foster parent, relative, household member, adult youth leader, recreational director who is an adult, adult athletic manager, adult coach, teacher, counselor, religious leader, doctor, or employer.

"· · · · · · · · · · · · · · · · · · · ·

"(c) Paragraphs (7), (8), (9), and (10) of subdivision (a) shall not apply when the court makes all of the following findings:

"(1) The defendant is the victim's natural parent, adoptive parent, stepparent, relative, or is a member of the victim's household who has lived in the household.

"(2) Imprisonment of the defendant is not in the best interest of the child.

"(3) Rehabilitation of the defendant is feasible in a recognized treatment program designed to deal with child molestation, and if the defendant is to remain in the household, a program that is specifically designed to deal with molestation within the family.

"(4) There is no threat of physical harm to the child victim if there is no imprisonment. The court upon making its findings pursuant to this subdivision is not precluded from sentencing the defendant to jail or prison, but retains the discretion not to. The court shall state its reasons on the record for whatever sentence it imposes on the defendant."

■ The parameters of the proscription against ex post facto laws are now well established. As defined by the United States Supreme Court in *Weaver* v. *Graham* (1981) 450 U.S. 24, 29 [67 L.Ed.2d 17, 23, 101 S.Ct. 960], ". . . two critical elements must be present for a criminal or penal law to be *ex post facto*: it must be retrospective, that is, it must apply to events

occurring before its enactment, and it must disadvantage the offender affected by it." (Fns. omitted; see also *In re Stanworth* (1982) 33 Cal.3d 176, 180 [187 Cal.Rptr. 783, 654 P.2d 1311]; *Morris* v. *Castro* (1985) 166 Cal.App.3d 33, 37; *In re Duarte* (1983) 143 Cal.App.3d 943, 946-947 [193 Cal.Rptr. 176].) The area in which ex post facto claims have surfaced most in recent years is release from custody, i.e., whether changes in statutes, rules, or guidelines which affect parole eligibility, parole review, or the availability of conduct credits, have ex post facto effect when applied to inmates whose crimes were committed prior to their enactment or adoption. As the California Supreme Court stated in *In re Stanworth, supra,* at page 181: "Some additional light is cast upon the issue before us by the judicial treatment of recent changes in the Federal Parole Commission and Youth Corrections Act. In a pre-*Weaver* decision, the Ninth Circuit rejected an ex post facto claim and approved the application of changes in parole guidelines which placed greater emphasis on general rather than special deterrence factors. [Citations.] However, other courts have found that a shift in the weight given to various factors in making parole determinations violated the ex post facto prohibition when applied to defendants convicted before enactment of the changes. [Citations.]"

■ Because section 1203.066 renders statutorily ineligible for probation a class of offenders who were not necessarily ineligible prior to its enactment, it is clear such offenders are disadvantaged by the statute and, when applied to crimes occurring before its effective date, section 1203.066 violates the proscription against ex post facto laws. Importantly, this question must be answered in general, and not merely in the context of a specific case since, as the People point out, defendant in this case was statutorily ineligible for probation under the law that existed at the time his offenses were committed. At that time, defendant would have been subject to the provisions of section 1203, subdivision (e)(5), which provided: "(e) Except in unusual cases where the interests of justice would best be served if the person is granted probation, probation shall not be granted to any of the following persons:

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(5) Unless the person has never been previously convicted once in this state of a felony or in any other place of a public offense which, if committed in this state, would have been punishable as a felony, any person who has been convicted of burglary with explosives, rape with force or violence, murder, attempt to commit murder, assault with intent to commit murder, trainwrecking, extortion, kidnapping, escape from the state prison, a violation of Section 286, 288, or 288a, or a conspiracy to commit one or more of such crimes."

The statutory ineligibility for probation reflected in section 1203, subdivision (e)(5), applies only to those persons with a prior felony conviction. Since this cannot be said as a matter of law of all persons convicted of violating section 288, and since section 1203.066 affects virtually the entire class of persons convicted of violating section 288, the fact that defendant would have been ineligible for probation under either the old law or the new does not vitiate the ex post facto effect of section 1203.066 when applied to crimes occurring before January 1, 1982, and its use by the court was error.

Therefore, we conclude that application of section 1203.066 to offenses occurring before its effective date violates the constitutional proscription against ex post facto laws by virtue of its stringent limitation on the trial court's discretion to grant probation.

The judgment is reversed.

Reid, J.,* concurred.

**HAMLIN, Acting P. J.,**—I dissent.

The court here confronts a case in which the molestation has been so consistent that the minor victim cannot recall distinct and identifiable acts within this course of conduct. Unfortunately, this is not unusual in the prosecution of a "resident child molester," that is, a person who either resides in the same home with the minor or otherwise has virtually unchecked access to the minor and who sexually abuses the minor on repeated occasions over a prolonged period of time.

If a child has been molested on a regular basis and in a consistent manner, e.g., "every day when my mommy went to work," "every weekend when I would stay with my dad," or "two or three times a week when Johnny would come to visit," the child may have no meaningful reference point of time or detail by which to distinguish one specific act from another. Obviously, the more frequent and repetitive the molestation and the younger the victim, the less likely it becomes that the prosecution can establish one or more specific acts via the testimony of the minor victim. Since many aberrant practices leave no permanent physical evidence and since children are usually molested outside the presence of witnesses, the testimony of the minor victim may be the only evidence on which the prosecution can base its case; rendering such testimony inadequate as a matter of law under circumstances like those here under discussion could effectively insulate the most egregious child molesters from prosecution.

---

*Assigned by the Chairperson of the Judicial Council.

Under these circumstances, the majority's requirement that either the prosecutor elect the specific acts of molestation on which it relies or the trial court instruct the jury in the language of CALJIC No. 17.01 or 4.71.5 (or their equivalent) that they must unanimously agree on the specific acts the defendant committed does not bear close scrutiny. Neither *People* v. *Williams* (1901) 133 Cal. 165 [65 P. 323], which focuses on prosecutorial election, nor *People* v. *Castro* (1901) 133 Cal. 11 [65 P. 13], which emphasizes the constitutional requirement of jury unanimity, in logic or common sense compels the majority's conclusion. I am not convinced that any of the fundamental concerns for a defendant's ability to present a defense or to have a unanimous jury verdict as expressed in *Castro* and *Williams* are served by requiring election or instruction on jury unanimity in cases where neither is realistically possible at the time of trial and the defendant can suggest no conceivable prejudice in the absence of election or a unanimity instruction.

I believe the concerns expressed in 1901 by the Supreme Court in deciding *Castro* and *Williams,* and recognized by subsequent courts when considering the prosecution of multiple offenses as requiring either election or a unanimity instruction, were grounded upon due process considerations in light of criminal procedure as it then existed. The linchpin of the due process analysis that shapes and permeates those cases is the ability of a criminal defendant to meaningfully prepare and present a defense to the charges against him. (See *People* v. *Dunnahoo* (1984) 152 Cal.App.3d 561, 571 [199 Cal.Rptr. 796].) It is simply not enough to state, in the abstract, that a criminal defendant has the right to be charged with and convicted of a particular act, nor that he has the right to a jury instruction on unanimity, nor that he has the right to compel the prosecutor to elect the act, upon evidence of which he intends to rest his case. All of these principles lead inexorably back to the defendant's ability to defend. If that ability has been curtailed by the state's failure to give the defendant adequate notice of the charges against him, or if the charges as made can be shown to lack specificity so that a defense cannot be mounted, the defendant should be entitled to dismissal of the charges against him or reversal of any resultant conviction. Existing procedures, including Penal Code section 1004 which permits a criminal defendant to demur to a complaint when the charging allegations considered in light of the transcript of the preliminary hearing do not provide sufficient certainty, ensure protection of the defendant's rights in the appropriate forum in a timely fashion. (See *People* v. *Jordan* (1971) 19 Cal.App.3d 362, 369-370 [97 Cal.Rptr. 570].)

So long as the evidence presented at the preliminary hearing supports the number of offenses charged against a defendant and covers the time frame or *time frames* charged in the information, a defendant has all the notice the

Constitution requires. Should a defendant in such circumstances feel the lack of greater specificity hampers his ability to prepare a defense, he may demur; to the extent the success of the demurrer depends upon an offer of proof concerning his intended defense, making such offer in camera ensures the defendant would not be compelled to prematurely disclose his defense strategy to gain the constitutionally adequate notice of the charges against him to which he is entitled. (Cf. *People* v. *Collins* (1986) 42 Cal.3d 378, 393-394 [228 Cal.Rptr. 899, 722 P.2d 173].)

There is nothing in this record to suggest that defendant was surprised at trial. He elected to stand on his denial that he had ever molested Linda. Thus the jury's task was to decide who was telling the truth, the victim or defendant. Necessarily there was jury unanimity on this issue. Nothing more was required in logic or in law. The absence of an election and the failure to instruct on jury unanimity that the majority deems reversible error were, in my opinion, irrelevant under the facts of this case.

Respondent's petition for review by the Supreme Court was denied April 27, 1988.