[No. F009135. Fifth Dist. Aug. 23, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
SAMUEL MUNIZ LUNA, Defendant and Appellant.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I and IV.

728

## COUNSEL

Philip F. Stanger, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Michael J. Weinberger and Thomas Y. Shigemoto, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PETTITT, J.**[*]—Defendant, Samuel Luna, was charged with 18 sexual offenses committed against his stepdaughter, A.

Prior to trial defendant made a motion to have a doctor of his choice perform a colposcopic examination of the victim.[1] The motion was granted. The victim's mother, R., refused to have the child submit to the examination. She consulted a psychologist and determined that it would not be in

---

[*] Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.

[1] A colposcope is an instrument which allows the doctor to magnify the area to be examined. It is not intrusive and can be equipped with a camera.

A.'s best interest. A. had already been examined twice. Defendant made a request for sanctions, and the court denied the request with the exception that the jury could be told that the minor child refused the examination.

Dr. Diamond had examined the victim utilizing a colposcope. Defendant objected to his testimony based on *Kelly-Frye*.[2] The court overruled the objection. The doctor testified to his findings. He also testified about the child abuse accommodation syndrome.

The jury found defendant guilty of six of the eighteen counts, counts VI, VIII, X, XII, XIII and XV. It also found that defendant engaged in substantial sexual conduct with a victim under the age of 11 years, occupied a position of special trust and committed an act of substantial sexual conduct within the meaning of Penal Code section 1203.066, subdivisions (a)(8) and (a)(9), respectively.[3] The jury could not reach a verdict on the remaining counts, which were subsequently dismissed. Defendant appeals.

## STATEMENT OF THE FACTS

The victim, A., was born March 13, 1977, to her mother, R. R. married defendant in 1982 when A. was five years old. In 1982 the three lived in an apartment on Michele Court. In February of 1983 they moved to a house on California Avenue. In November of 1984 they moved to an apartment on Miller Street. They lived there two months and moved to an apartment near White Lane and Teal. They lived at this address until August of 1985 when A. told her mother that defendant had molested her. R. chased defendant out of the house with a knife, and they no longer lived together.

All counts alleged that the acts occurred between August 1, 1982, and October 10, 1985. Count VI alleged that while the family lived on California Avenue defendant touched his mouth to the genitals of A. in violation of section 288, subdivision (a). A. testified that when they lived on Michele Court defendant repeatedly touched her "privates" and had her rub his penis. When they moved to California Avenue, defendant began putting his mouth on her "privates." This occurred in her room, his room and the living room.

Count VIII alleged that while the family was residing on Miller Street defendant touched his fingers to A.'s genitals in violation of section 288, subdivision (a). A. testified to a particular instance on Miller Street when

---

[2] *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013 [54 App.D.C. 46, 34 A.L.R. 145]. The rule involves the use and reliability of new scientific techniques.

[3] Further statutory references are to the Penal Code unless otherwise indicated.

defendant was playing the drums and she was watching TV. Defendant came down and stuck his finger in her "privates." A. was wearing shorts. Defendant tried to pull them off and was initially unsuccessful because A. was sitting down. He eventually pulled them off.

Count X alleged that while living on Miller Street defendant touched his mouth to the genitals of A. in violation of section 288, subdivision (a). A. testified that she remembered a day on Miller Street when defendant put his mouth on her "privates." She could not remember the room and was pretty sure it was during the day. A.'s mom was gone. Defendant was lying down and he put his tongue on her privates.

Counts XII and XIII alleged that while living in the apartment on White Lane and Teal defendant touched his fingers to A.'s genitals in violation of section 288, subdivision (a). Count XV related to the same location but involved defendant touching his mouth to A.'s genitals. A. testified that defendant put his finger in her privates in his room and her room when no one else was home. A. testified that defendant put his mouth on her privates on Teal Street. A. testified that defendant would show her magazines of girls doing what he did to her. He also had her watch a pornographic movie. He told A. to do what they did in the magazines. Defendant offered her money while living on Teal Street if she did what he said. He offered her differing amounts—$2, $3 or $5. However, he never actually paid anything to A. In August of 1985 A. told her mother that defendant had been touching her privates. She testified that the day she told her mother was one of the days "that he did it to me."

A. testified to numerous other acts of the same nature as well as acts of anal and vaginal intercourse. She further testified that on occasions defendant would put his sock over the tip of his penis while A. would rub his penis. She also testified she rubbed his penis until he ejaculated.

Dr. Diamond examined A. and used a colposcope during his examination. In describing injuries to the vagina and hymen, Dr. Diamond identified the position of the injuries by referring to hours on a clock, 12 o'clock being the top of the vaginal opening when the victim is examined in the supine position. He testified that trauma caused by athletic injuries and masturbation usually occur between the nine to three o'clock position, while injuries from the insertion of another person's finger or penis usually occur between the three to nine o'clock position. A. had trauma in the three to five o'clock and seven to eight o'clock positions, which was consistent with what A. said happened to her.

Dr. Diamond also testified regarding the child abuse accommodation syndrome.

A.'s mother testified that A. was left alone with defendant on numerous occasions. She talked to A. on several occasions about good and bad touchings. In the presence of the defendant, A.'s mother asked A. if she had been touched in a bad way. A. said no. R. testified to one occasion when she came home and found defendant masturbating with a sock over his penis. Two teachers and the principal from A.'s school testified that A. was an honest child.

### Defense

Defendant denied any sexual conduct with A. He denied ever using a sock to cover his penis.

Defendant's sister and her husband testified that once when they were visiting defendant and his family, A.'s mother and A. came out of the bathroom. They were both upset because A. had stuck something up inside herself. Two of defendant's sisters and defendant's brother-in-law also testified that when defendant and R. would talk about having a baby, A. would make a face. Defendant's sister testified that R. often talked about sex in front of A., as well as child molestation, which was discussed by this sister and R. in the presence of A.

On appeal defendant contends the trial court failed to impose any meaningful sanction for the victim's refusal to be examined by defendant's doctor; the colposcope is a new, scientific technique which comes within the ambit of the *Kelly-Frye* rule; it was error to allow evidence regarding the child abuse accommodation syndrome; and, finally, the court erred in denying cross-examination of R. regarding molestation of her.

### Discussion

I. *Did the court impose appropriate sanctions for the victim's refusal to submit to an examination by the doctor of defendant's choice?* *

. . . . . . . . . . . . . . . . . . .

II. *Is the use of a colposcope a new scientific technique which must meet the requirements of the Kelly-Frye rule?*

Dr. Diamond examined A. and used a colposcope to aid in this examination. He testified that the colposcope does nothing more than magnify the

---

* See footnote, *ante,* page 726.

object. His testimony was that it increased his magnification to 10. The colposcope merely makes injuries more easily identifiable. It does not produce results. The results are based on the doctor's medical knowledge. Defendant objected to Dr. Diamond's testimony because the use of the colposcope is a new scientific method not generally accepted in the medical community. The trial court found that a colposcopic examination is not a radical departure from general medical techniques and allowed Dr. Diamond to testify.

 Defendant asserts that a colposcopic examination must meet the *Kelly-Frye* rule.[4] Defendant contends that there was no showing of compliance with the *Kelly-Frye* rule and the court should not have allowed the testimony of Dr. Diamond which arose from the use of the colposcope. We disagree.

This precise issue was decided in *People* v. *Mendibles* (1988) 199 Cal.App.3d 1277 [245 Cal.Rptr. 553]. We agree with that court's analysis and decision on this issue. In *Mendibles,* a Dr. Heger examined the alleged victims of child molestation with a colposcope. That is precisely what occurred in the instant case. The colposcope, as described in defendant's exhibit A which was received in evidence by the trial court, is nothing more than a modality of binocular magnification with a 5x to 30x potential. It has been in use for years to study cervical pathology and for detection of early carcinoma in situ, and is used as well as a tool for clarifying the diagnosis of sexual abuse. The instrument is in general use in the medical community in situations where it is beneficial to make areas of the body more visible to the examining physician by the direction of light to the area on which the binoculars are focused. The instrument was not inserted in the vaginal canal.

According to Dr. Diamond and exhibit A, the colposcope has been in use at least since 1977. Of course, the ordinary microscope has long been accepted as scientifically reliable. The opinions given by the witness at trial were based on his visual examination and observations made more vivid with the aid of the colposcope. Beyond that, the opinions were "Based on my own medical knowledge and observation."

 The *Kelly-Frye* rule requires that a new scientific technique meet a two-prong test in order to be admissible. First, the reliability of the method must be established. This is usually by expert testimony. Second, the witness giving the reliability testimony must be properly qualified to give an opinion on the subject. "Additionally, the proponent of the evidence must

---

[4]See footnote 2, *ante,* page 730.

demonstrate that correct scientific procedures were used in the particular case. [Citations.]" (*People* v. *Kelly, supra,* 17 Cal.3d 24, 30.)

■ There is a recognized difference between the development of a new scientific technique, i.e., "a novel method of proof" (*ibid.*) and the development of a body of medical knowledge and expertise.

"It is important to distinguish in this regard between expert testimony and scientific evidence. When a witness gives his [or her] personal opinion on the stand—even if he [or she] qualifies as an expert—the jurors may temper their acceptance of [t]his testimony with a healthy skepticism born of their knowledge that all human beings are fallible. But the opposite may be true when the evidence is produced by a machine; like many laypersons, jurors tend to ascribe an inordinately high degree of certainty to proof derived from an apparently 'scientific' mechanism, instrument or procedure. Yet the aura of infallibility that often surrounds such evidence may well conceal the fact that it remains experimental and tentative. [Citations.] For this reason, courts have invoked the *Kelly-Frye* rule primarily in cases involving novel devices or processes . . . . [¶] . . . We have never applied the *Kelly-Frye* rule to expert medical testimony, even when the witness is a psychiatrist and the subject matter is as esoteric as the reconstitution of a past state of mind or the prediction of future dangerousness, or even the diagnosis of an unusual form of mental illness not listed in the diagnostic manual of the American Psychiatric Association [citation]." (*People* v. *McDonald* (1984) 37 Cal.3d 351, 372-373 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].)

■ New techniques which are subject to the *Kelly-Frye* requirements of reliability and acceptance in the relevant scientific community are techniques like hypnosis-induced testimony (*People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 641 P.2d 775]), voiceprint identification (*People* v. *Kelly, supra,* 17 Cal.3d 24), bitemark identification (*People* v. *Slone* (1978) 76 Cal.App.3d 611, 625 [143 Cal.Rptr. 61]), and the use of "truth serum" or sodium pentothal (*People* v. *Jones* (1959) 52 Cal.2d 636, 653 [343 P.2d 577]).

■ A colposcopic examination need not meet the requirements of the *Kelly-Frye* rule. Dr. Diamond's testimony regarding his results of the examination were properly admitted.

III. *Did the court erroneously allow evidence regarding the child abuse accommodation syndrome?*

Dr. Diamond testified regarding his particular findings following his examination of A. Following this testimony, the prosecution began to elicit

testimony about Dr. Diamond's knowledge of the child abuse accommodation syndrome. At this point, defendant requested a bench conference which was followed by a hearing outside the presence of the jury. Defendant then conducted a short voir dire examination of Dr. Diamond on the syndrome. Citing *People* v. *Gray* (1986) 187 Cal.App.3d 213 [231 Cal.Rptr. 658], the prosecution sought to introduce the testimony. Defense counsel objected, asserting that *Gray* was wrongly decided, that Dr. Diamond's testimony would be utilized to show that A.'s testimony should be credited, and that Evidence Code section 352 should prohibit the testimony. The trial court granted the prosecution's motion to present Dr. Diamond's testimony regarding the syndrome. The trial court specifically ordered that the testimony could not be elicited until the prosecution completed the doctor's testimony with regard to A., the prosecution could not return on direct examination to opinions about A., and the prosecution must make it clear to the jury that Dr. Diamond's testimony regarding the syndrome would be related to victims in general and not this particular victim. The prosecution followed the court's directions and prefaced his questions to Dr. Diamond in the following way:

"MR. GINDES: Q. Doctor Diamond, based on your readings in this field, this is a question about people, victims sexually abused in the home in general, not a specific opinion about this case.

"Do you have an opinion about whether children who are molested in the home suffer from a certain type of syndrome?" Dr. Diamond then described the child abuse accommodation syndrome as consisting of five portions: (1) secrecy, (2) helplessness, (3) accommodation, (4) disclosure, and (5) retraction. He elaborated on each phase of this syndrome. Dr. Diamond did not relate this testimony to the particular victim, A.

 Defendant objects to this testimony on two grounds. First, defendant distinguishes this case from *People* v. *Gray, supra,* 187 Cal.App.3d 213, because Dr. Diamond had testified regarding the particular victim before he testified regarding the syndrome. Next, defendant objects to the limited expertise and qualifications of this witness.

We shall discuss the second assertion first. Defendant has waived an objection to Dr. Diamond's qualifications on this subject since no objection on this ground was made below. (Evid. Code, § 353.) Furthermore, we note that an objection would probably have been futile in light of Dr. Diamond's extensive credentials, qualifications and experience.

The first assertion is more involved. In *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291], the court held that expert testimony

on the aftereffects of rape may be admissible for some purposes but is not admissible to prove that a rape had occurred. (*Id*. at p. 238.) At trial the victim's rape counselor was called to testify that the victim suffered from "rape trauma syndrome." (*Id*. at p. 240.) She explained rape trauma syndrome and went on to describe her contacts with and general conclusions about the victim. (*Id*. at pp. 242-243.) She concluded that the victim was suffering from rape trauma syndrome. (*Id*. at p. 244.) The Supreme Court found that the admissibility of this type of testimony turns on the "nature of the particular evidence and its relation to a question actually in issue in the case." (*Id*. at p. 246.) Although the court held that the testimony was error because it was offered to prove a rape had occurred, the court thought such testimony would be helpful to aid the jury in evaluating the evidence free of the constraints of popular myths. (*Id*. at p. 248.)

In *People* v. *Roscoe* (1985) 168 Cal.App.3d 1093 [215 Cal.Rptr. 45], this court analyzed the *Bledsoe* decision in terms of an expert testifying regarding victims of child molestation and found that much of the same reasoning applied to both child molestation and rape. (*Id.* at p. 1098.) This court held that the trial court erred in allowing the psychologist to testify that he diagnosed the complainant as a molestation victim. (*Id.* at pp. 1100-1101.) "[T]he expert testimony authorized by *Bledsoe* to permit rehabilitation of a complainant's credibility is limited to discussion of victims as a class, supported by references to literature and experience (such as an expert normally relies upon) and does not extend to discussion and diagnosis of the witness in the case at hand." (*Id*. at p. 1100.) "The doctor's discussion of the specific facts of this case in support of his conclusion that the complainant was indeed a victim of molestation by the defendant had all the force of a district attorney's closing argument, and even greater impact since it was delivered in clinical terms by a 'doctor' purporting to make an objective scientific analysis." (*Ibid*.)

In *People* v. *Gray, supra,* 187 Cal.App.3d 213, the nine-year-old victim testified that her stepfather, the defendant, molested her. A child psychologist testified about the child abuse accommodation syndrome. He confined his testimony to experiences and behavioral traits common to child abuse victims. (*Id*. at p. 216.) Relying on *Roscoe* and *Bledsoe,* the court found no error in allowing the expert to testify regarding the syndrome.

■ The instant case presents a new twist to the above facts because not only did Dr. Diamond examine A. and testify to his findings, he also testified regarding the child abuse accommodation syndrome; however, during this testimony he did not discuss or diagnose A. Although this scenario has potential for problems, the trial court took appropriate steps to alleviate the potential error. The jury was made aware that the testimony regarding

the child abuse accommodation syndrome related to victims as a class and was not a discussion of or a diagnosis of A. Thus, the concerns of *Roscoe* and *Bledsoe* are not present here. Dr. Diamond's testimony was in essence testimony of two expert witnesses, one testifying regarding the particular results of the examination of A., and one testifying regarding the child abuse accommodation syndrome. The People should not be precluded from calling one of the foremost experts in the area to testify regarding the child abuse accommodation syndrome merely because he also examined the victim, so long as his testimony is sufficiently separated so the jury is not confused and is able to distinguish the two types of testimony. Although the trial court ordered appropriate safeguards to ensure the separation of the testimony, a further measure which could be utilized in future cases, if the same situation should arise, would be to allow the expert to testify on one subject, complete with cross-examination, and then allow the expert to testify on the other subject.

Dr. Diamond's testimony was properly admitted.

IV. *Did the court improperly deny cross-examination of R. regarding molestation of her?* *

. . . . . . . . . . . . . . . . . . . . . .

V. *Did the prosecution fail to meet its burden of proof as to counts VI, XII, XIII and XV due to lack of any specific evidence of the occurrence of a particular act?*

Appellant had not challenged the sufficiency of proof as to any count. We therefore requested additional briefing on that matter as to the counts about which we perceived problems. Those counts are enumerated in the caption set out above. We have considered the additional briefs and other law on the subject.

This issue presents a problem which has been encountered by this court on repeated occasions in the recent past. Indeed, it has been the subject of a dissenting opinion in *People* v. *Martinez* (1988) 197 Cal.App.3d 767 [243 Cal.Rptr. 66], and a unanimous opinion in *People* v. *Van Hoek* (1988) 200 Cal.App.3d 811 [246 Cal.Rptr. 352]. In 1987 the same issue was the subject of other opinions emanating from this court, which are not published opinions. The latest opinion of this court on the same tragic subject appears in *People* v. *Atkins* (1988) 203 Cal.App.3d 15 [249 Cal.Rptr. 863]. The author

---

* See footnote, *ante,* page 726.

of the instant opinion concurred in the opinion by Justice Ballantyne in *Atkins*. At the same time, we borrow from Justice Hamlin in his dissent in *People* v. *Martinez, supra,* 197 Cal.App.3d 767, wherein he wrote: "The court here confronts a case in which the molestation has been so consistent that the minor victim cannot recall distinct and identifiable acts within this course of conduct. Unfortunately, this is not unusual in the prosecution of a 'resident child molester,' that is, a person who either resides in the same home with the minor or otherwise has virtually unchecked access to the minor and who sexually abuses the minor on repeated occasions over a prolonged period of time.

"If a child has been molested on a regular basis and in a consistent manner, e.g., 'every day when my mommy went to work,' 'every weekend when I would stay with my dad,' or 'two or three times a week when Johnny would come to visit,' the child may have no meaningful reference point of time or detail by which to distinguish one specific act from another. Obviously, the more frequent and repetitive the molestation and the younger the victim, the less likely it becomes that the prosecution can establish one or more specific acts via the testimony of the minor victim. Since many aberrant practices leave no permanent physical evidence and since children are usually molested outside the presence of witnesses, the testimony of the minor victim may be the only evidence on which the prosecution can base its case; rendering such testimony inadequate as a matter of law under circumstances like those here under discussion could effectively insulate the most egregious child molesters from prosecution." (*Id.* at p. 778.) Respondent herein quotes the second of the above two paragraphs in his letter brief responding to our request.

We share in the concerns expressed by Justice Hamlin. It may well be time to redefine the crime resulting from acts of child molestation in continuum and the type of proof necessary to sustain a conviction in these cases. We will return to this subject later in this opinion.

We conclude there was sufficient evidence to sustain the convictions as to counts VI, VIII and X. (The latter two counts were not the subjects of our concern.) We conclude there was not sufficient evidence as to counts XII, XIII and XV. The latter three counts were subjects of our concern along with count VI.

 Upon further examination of the trial transcript, we are satisfied that as to count VI there was sufficient specificity in the proof offered.

Appellant's entire argument in his letter brief is based on the statements of this court in *Van Hoek* where the judgment was reversed as to all counts,

seven counts of lewd and lascivious conduct (§ 288, subd. (a)) and one count of unlawful sexual intercourse (§ 261.6). Appellant recognizes the instant case benefits from the corroboration supplied through the testimony of Dr. Diamond, there being no corroboration in *Van Hoek,* but contends that difference is of no moment here. We agree with appellant in this regard. Such corroboration, as redeeming as it may be to the frail testimony of a molested child, does not fill a void as to the necessity of charging a specific criminal act and proof of such act.

The district attorney in this case charged each act with the same specificity as is exemplified in count VI of the information as follows: "That said SAMUEL MUNIZ LUNA, or on about and between August 1, 1982 and October 10, 1985, and in the following locations, to wit: a house on California Avenue, at and in said County of Kern, State of California, did willfully, unlawfully and lewdly commit a lewd and lascivious act upon and with the body of [A.], age 5, a child under the age of fourteen years, in that said defendant did touch his mouth to the genitals of said victim, and such was done with the intent of arousing, appealing to, and gratifying the lust, passions and sexual desires of said defendant and said child, all in violation of Section 288(a) of the Penal Code, a felony."

Respondent correctly points out that though count VI alleges the act occurred "on or about and between August 1, 1982 and October 10, 1985, and in . . . a house on California Avenue," the record shows that such offense must have occurred between February of 1983 and November of 1984 because that is the period of time during which the family lived on California Avenue.

With respect to counts VIII and X we note that though the information alleges the same lengthy time period, the record reflects the family only lived in an apartment on Miller Street for two months, approximately November and December 1984. The crimes charged in counts VIII and X were alleged to have occurred in "an apartment on Miller Street . . . ."

We believe the information was as explicit as it reasonably could be, given the circumstances of appellant's repeated conduct and the tender years of his victim.

The victim, who was ten years of age at the time she testified, and would have been from almost six years of age to well into her seventh year at the time of the offense stated in count VI, gave the following testimony concerning the oral copulation alleged therein:

"Q. Now, we have talked about your privates, the part between your legs, okay. Now we're on California Street, right.

"A. Yes.

"Q. You are living in the California Street house. Now, did Sammy start doing things with his mouth to you?

"A. Yes.

"Q. Okay. Now, why don't you tell us one thing that Sammy, on California Avenue, did with his mouth to you?

"A. He put his mouth on my private.

"Q. Can you tell us what room that was in?

"A. Sometimes it would happen in his room or my room or the living room.

"Q. Can you tell us what, see if you understand this question, what position you were in when he put his mouth on your private, he would put his mouth on your private? Do you understand that question? Position means, were you sitting, standing up, laying down, or what?

"A. I was, I was standing up.

"Q. Okay. What did Sammy do?

"A. He was laying down under me and—

"Q. Pardon?

"A. He was laying down under me and he put his mouth on my private.

"Q. All right. When he put his mouth on your private, would he do something with his mouth to your private?

"A. No, I can't remember. I don't think so.

"Q. Would he do something with his tongue?

"A. Yes.

"Q. What did he do with his tongue?

"A. Move it around.

"Q. Did he move it around outside of you or did he put his tongue inside you?

"A. Inside.

"Q. When Sammy did that, do you remember whether he had his clothes on or off, do you remember that?

"A. No.

"Q. Okay. Was that the only position that he would use, excuse me.

"Would Sammy ever do that to you when you were laying down, that is, put his mouth on your private?

"A. Yes.

"Q. Tell us about how he would do that?

"A. We were in his room, I was laying on the bed and he would turn around and put his mouth on my private.

"Q. What did he do when he got his mouth on your private?

"A. He would stick his tongue.

"Q. Would Sammy make any noises when he was doing this?

"A. No."

We find this testimony meets the requirements of *People* v. *Castro* (1901) 133 Cal. 11 [65 P. 13] and *People* v. *Williams* (1901) 133 Cal. 165 [65 P. 323]. We also see a clear distinction between the testimony of A. in the instant case and that of the child victims in *Martinez* and *Van Hoek*. In *Martinez* defendant was charged with and convicted of 20 counts of lewd and lascivious acts with his stepdaughter starting when she was approximately 9 years of age. She was 18 years old at the time of trial. Her testimony suggested "in excess of 200 separate acts of molestation occurring over a period of 32 months." (197 Cal.App.3d at pp. 771-772.) The court did not compel an election by the prosecution as to which specific act they were proceeding on in each count or instruct the jury sua sponte that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act. This duty in the alternative is sometimes called the "either/or" rule. In the instant case the court instructed the

jurors in both the language of CALJIC Nos. 4.71.5 and 17.01.[5] Therefore, the reason for reversal in *Martinez* is not present here.

In *Van Hoek,* defendant was found guilty of seven counts of lewd and lascivious conduct and one count of unlawful sexual intercourse with his daughter, who was fifteen years of age at the time of trial. The molestation started when the victim was three years old and continued for approximately ten years. The family lived in Hanford the first half of 1980 and on Olive Street in Lemoore from August of 1980 until June of 1985. The victim's testimony indicated the acts occurred with great frequency. She was specific about only three occasions but gave no date nor specifics about which residence the event took place, except that one she described occurred when she was living in Hanford. On that occasion, she said the defendant molested her. Count I was charged and found as occurring on or about January 1983; count II was charged and found as occurring on or about April 1983; and counts III, IV, V, VI and VII were charged and found as occurring on or about 1985, 1984, 1982, 1981 and 1980, respectively. The unlawful sexual intercourse (count VIII) was charged and found as occurring on or about 1983. Thus we see there was no testimony about an event that could be connected with the date of any of the charges, excepting the one in 1980. But the testimony as to it was devoid of any detail.

Respondent believes *Van Hoek* was wrongly decided but refers to some of what this court stated there. ■ We reiterate that the "either/or" rule can have no application in a case where there is a failure to present evidence of *any* specific act to support the charged crime. There, the problem is not one of jury unanimity or election by the prosecution. It is, instead, a due process problem which cannot be cured by an election or unanimity instruc-

---

[5] CALJIC No. 4.71.5, as given, reads: "Defendant is charged in sixteen counts of the information with the commission of crimes constituting violations of Section 288(a) of the Penal Code and a count charging the commission of a violation of Section 288a(c) of the Penal Code. The 16 counts are alleged to have occurred on or about a period of time between August 1, 1982 and October 10, 1985. The charge of violation of Penal Code section 288a(c) is alleged to have occurred between January, 1985 and September, 1985.

"In order to find the defendant guilty, it is necessary for the prosecution to prove beyond a reasonable doubt the commission of a specific act [or acts] constituting the crime charged in a given count within the period alleged in that count.

"And, in order to find defendant guilty, you must unanimously agree upon the commission of the same specific act [or acts] constituting said crime within the period alleged.

"It is not necessary that the particular act or acts committed and so agreed upon be stated in the verdict."

CALJIC No. 17.01 as given states: "The defendant is charged with the offense of lewd acts with a child as to the first 16 counts and oral copulation as to the last count. He may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of such acts, but in order to find the defendant guilty as to any count, all the jurors must agree that he committed the same act or acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

tion. As was stated in *Williams*: "In this case, as well as in any other, the prosecution must charge a specific offense, and the conviction, if one is had, must depend upon the proof of that offense alone. Other incidents are important only as tending to prove the *one* specific offense for the alleged commission of which defendant is on trial." (*People* v. *Williams, supra,* 133 Cal. at p. 168.)

The essence of this court's concern has been a failure to present evidence of *any* specific act to support the charged crime. Our most recent case of *People* v. *Atkins, supra,* 203 Cal.App.3d 15 is a case where defendant was convicted of five sex crimes committed against his minor stepdaughter. We found proof wholly inadequate to sustain two of those convictions.

"As previously set forth, N. testified with particularity to specific incidents to support counts I, III and IV. We are concerned here with the sufficiency of N.'s testimony to support defendant's convictions on counts II and V. As to count II, other than N.'s statement that an act of oral copulation took place in 1985, there was absolutely no testimony specifying with any detail the particular act which would support this count. Count V is even more troubling. Not only did N. not testify to a particular act of sexual intercourse occurring in 1986, testimony regarding sexual intercourse in 1986 was virtually nonexistent. As we shall discuss, the prosecutor did not meet his burden to prove a specific offense with regard to counts II and V. Such a failure results in our finding that there is insufficient evidence to support these counts, and the judgment must be reversed as to these counts with retrial barred." (*People* v. *Atkins, supra,* 203 Cal.App.3d at p. 19.)

The current case did have evidence of specific acts to support the crimes charged in counts VI, VIII and X. The latter two crimes occurred on Miller Street where the family lived only two months.

Part of the testimony on count VIII was:

"Q. Start out with one of them, just tell us one of the things that Sammy would do?

"A. He would put his hand on my private.

"Q. Tell us about that, see if you can remember a time that sort of stands out. Tell us what Sammy did, what room you were in, when it was, the best that you can do.

"A. In the living room.

"Q. Okay. Tell us what happened in the living room?

"A. We were playing, or he was playing the drums and he came down and I was watching TV and he went and sat down next to me and he touched my private with his hand and then he stuck his finger in my hand.

"Q. In your hand?

"A. In my private part.

"Q. Do you remember what you were wearing when he did that?

"A. No. I was wearing shorts, shorts.

"Q. Pardon?

"A. Shorts.

"Q. Did Sammy do something to your shorts before he did that to you, before he touched your private?

"A. Yes.

"Q. What did he do?

"A. He pulled them down. Tried to pull them down.

"Q. What does that mean, [A.]?

"A. What?

"Q. You said that he tried to pull them down, what does that mean?

"A. He couldn't. I was sitting down.

"Q. Okay. So what happened to your shorts?

"A. He still pulled them off.

"Q. Then what did he do?

"A. And then that is when he put his finger in my private part."

Part of the testimony on count X, which also occurred on Miller Street, was:

"Q. Okay. Tell us what Sammy did to you with his mouth on your private?

"A. He did the same thing that he did when we were living somewhere else, when he was laying down.

"Q. Sammy was laying down?

"A. Yes.

"Q. Did he do something with his teeth or his mouth or his tongue?

"A. His tongue.

"Q. What did he do with that?

"A. He moved it around.

"Q. Where, [A.]?

"A. In my, in my private.

"Q. Now, did Sammy make you do something with your mouth on Miller Street?

"A. Yes.

"Q. What did Sammy have you do with your mouth?

"A. Put my mouth on his private.

"Q. Can you remember a room that he did this in?

"A. In, in his bedroom.

"Q. Okay. What part of his bedroom were you in when he did this to you, when he made you put your mouth on his private?

"A. He was sitting down on the bed."

These excerpts from the victim's testimony refer to a specific act jurors may unanimously agree upon as to time and place as being that charged in the information.

■ The victim's testimony regarding counts XII, XIII and XV was not specific as to any identifiable act and was only generic in nature. It is only in such a circumstance that this court held in *Van Hoek* that the "either/or" rule—prosecutor's election or instruction in the language of CALJIC Nos. 4.71.5 and/or 17.01—cannot cure the problem. Respondent cites *People* v. *Gordon* (1985) 165 Cal.App.3d 839, 853, 868 [212 Cal.Rptr. 174], and other authority as confirmation of its position. These authorities fail to alleviate the problem when there is no definitive evidence of an identifiable act for the jury to consider and deal with.

Respondent refers to testimony concerning a one-time borrowed video cassette recorder appellant used to show the victim pornographic movies, and to the fact "it" had occurred on the day A. finally broke down and told her mother the sorry story. We carefully considered these same circumstances, but there was no testimony of a sex act occurring at the time the video cassette recorder was used, nor was there any effort whatsoever to present proof of what "it" consisted of on the day the victim brought the long ordeal to an end. The prosecution simply failed to prove the final sex offense, which it appears it could have done with particularity. We cannot assume what was meant by "it" since the appellant did not confine himself to one type of sexual abuse, nor can we supply any of the other specificity it would seem the victim could have provided, if asked. Furthermore, the jurors could not have related this testimony to a particular count because each count charged a specific sex act, i.e., oral copulation, sexual intercourse.

The real disagreement between respondent and this court is in whether the said "either/or" rule should be permitted to cure what is otherwise a marked failure of proof inherent in many "resident child molester" cases. This court did not in *Van Hoek,* and does not here, hold the rule simply cannot ever be effectively applied in these cases to cure the peculiar problems related to the testimony of a child who has been repeatedly violated by a person living in the home with the child. We only hold that, in view of *Castro* and *Williams,* and the fact neither the Legislature nor our Supreme Court has declared these sex crimes in continuum to constitute a single offense, we are constrained by these Supreme Court cases, aged as they may be.

A case can be made for recognizing the repeated sexual abuse of helpless children as a part of the conglomerate continuous-crime exception that applies to pandering (*People* v. *White* (1979) 89 Cal.App.3d 143, 151 [152

Cal.Rptr. 312]), child abuse (*People* v. *Ewing* (1977) 72 Cal.App.3d 714, 717 [140 Cal.Rptr. 299]), and contributing to the delinquency of a minor (*People* v. *Lowell* (1946) 77 Cal.App.2d 341, 346-348 [175 P.2d 846]). (See also *People* v. *Diedrich* (1982) 31 Cal.3d 263 [182 Cal.Rptr. 354, 643 P.2d 971].) The latter case and others following it suggest that where the defendant has only one defense and alibi is impossible under the repeated live-in circumstances, it is not even necessary to give CALJIC No. 4.71.5 or 17.01 because it is clear the jury simply rejected the defendant's denial as opposed to the victim's positive, though unspecific, testimony. (*People* v. *Deletto* (1983) 147 Cal.App.3d 458, 466-467 [195 Cal.Rptr. 233]; *People* v. *Parsons* (1984) 156 Cal.App.3d 1165, 1174 [203 Cal.Rptr. 412].) Those jury instructions were given here, so this case does not present the question of whether they are essential where a resident sex offender commits multiple acts over a period of considerable time.

Before proceeding further, we desire to express the obvious fact many changes have taken place since *Castro* and *Williams* were decided in 1901. One is the preliminary hearing process.

"California's system of criminal pleading under section 952 relies in part upon the transcript of the grand jury hearing or preliminary examination which must be furnished to the defendant to inform him of particular circumstances of his offense not shown by the accusatory pleading [citations]. . . .

"Since the constitutional application of section 952 relies in part upon notice afforded by the transcript, it follows a demurrer under section 1004 for failure of the indictment to substantially conform to section 952 contemplates testing the adequacy of the notice to defendant by allegations in the language of the statute *when viewed in light of the transcript.*" (*People* v. *Jordan* (1971) 19 Cal.App.3d 362, 369-370 [97 Cal.Rptr. 570]; see also *People* v. *Tolbert* (1986) 176 Cal.App.3d 685, 690, fn. 2 [222 Cal.Rptr. 313].)

In light of these principles of California pleading, we cannot perceive any incurable due process impediment to informations which charge a criminal defendant with multiple counts of the same offense so long as the information informs the defendant of the nature of the conduct of which he is accused and the evidence presented at the preliminary hearing informs him of the particulars of the offenses which the prosecution may prove at trial. As Justice Sims points out in his concurring opinion in *People* v. *Gordon, supra,* 165 Cal.App.3d 839, 870-871: "These rules make it clear that an information plays a limited but important role: it tells a defendant what *kinds* of offenses he is charged with (usually by reference to a statute violat-

ed), and it states the *number* of offenses (convictions) that can result from the prosecution. But the time, place and circumstances of charged offenses are left to the preliminary hearing transcript; it is the touchstone of due process notice to a defendant.

"In light of the notice function played by the preliminary hearing transcript, a prosecutorial election is unnecessary to advise defendant of the criminal acts he must defend against. When *Williams* [*People* v. *Williams, supra,* 133 Cal. 165] asks, 'how could he defend when he was not informed as to what particular offense, out of hundreds testified to by the prosecutrix, he was to be tried?' (citation), the modern answer is that, at a minimum, a defendant must be prepared to defend against all offenses of the kind alleged in the information as are shown by evidence at the preliminary hearing to have occurred within the timeframe pleaded in the information."

So long as the evidence presented at the preliminary hearing supports the number of offenses charged against a defendant and covers the time frame or time frames charged in the information, a defendant has all the notice the Constitution requires. Should a defendant in such circumstances feel the lack of greater specificity hampers his ability to prepare a defense, he may demur; to the extent the success of the demurrer depends upon an offer of proof concerning his intended defense, making such offer in camera ensures the defendant would not be compelled to disclose prematurely his defense strategy to gain the constitutionally adequate notice of the charges against him to which he is entitled. (Compare *People* v. *Collins* (1986) 42 Cal.3d 378, 393-394 [228 Cal.Rptr. 899, 722 P.2d 173].) Thus *Castro* and *Williams* could well be reexamined in the light of notice through preliminary hearings which were not a part of our system 87 years ago. (*People* v. *Gordon, supra,* 165 Cal.App.3d 839, 868-869; *People* v. *Dunnahoo* (1984) 152 Cal.App.3d 561 [199 Cal.Rptr. 796].)

Also, the strict requirements of *Castro* and *Williams* have an aura of simple and essential justice which may not be entitled to the unbending respect they still demand. The continuing enormity of multiple sex acts committed upon children, as we see more frequently today, dictates a closer look at the very practical problems created by resident sex offenders against children. Multiple sex offenses committed by adults upon immature and inarticulate children over a long period of time are very likely to result in an amalgamation of the crimes in the child's mind. The child is unlikely to be able to give any testimony approximating the date of any one separately describable offense even in the uncomplicated case. Where the number of offenses is so numerous even an adult would not be able to count them, the child's testimony will often be reduced to a general, and customarily abbreviated, recitation of what happened on a continuing basis.

Further reexamination of *Castro* and *Williams* might also be overdue because of the revolutionary change that has taken place in our society, including changes with respect to the credibility and dignity we extend to adult women and children who are the victims of sexual assault. First, we must bear in mind the fact *Castro* and *Williams* involved what today would be called unlawful sexual intercourse. The safeguards provided by Evidence Code section 782 since 1974 are a principal manifestation of the Legislature's departure from the archaic thinking of men like Professor Wigmore, who stated, " '[n]o judge should ever let a sex offense charge go to a jury unless the female complainant's social history and medical makeup have been examined and testified to by a qualified physician.' " (Mertens, *Child Sexual Abuse in California; Legislative and Judicial Responses* (1985) 15 Golden Gate L.Rev. 437, 459-460.) Modern protections also apply to children. (*People* v. *Fritts* (1977) 72 Cal.App.3d 319, 326 [140 Cal.Rptr. 94].)

However, until the Legislature or a higher court reexamines the matters of proof, due process, and the element of continuum as they relate to the "resident child molester" case, we feel compelled to stay within the parameters of the law as presently fixed.

The judgment is affirmed as to counts VI, VIII and X. It is reversed as to counts XII, XIII and XV. The case is remanded to the trial court for resentencing in accordance with this opinion.

Woolpert, Acting P. J., and Best., J., concurred.