[Crim. No. 6595. Fifth Dist. Apr. 16, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY WAYNE METHENEY, Defendant and Appellant.

## COUNSEL

Alan M. Caplan, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, J. Robert Jibson and Jana L. Tuton, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

FRANSON, Acting P. J.—Appellant was convicted following a jury trial of the crime of accessory after the fact, in violation of Penal Code section 32.[1] He makes several contentions on appeal but we need only discuss one—

---

[1]Penal Code section 32 provides: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony."

that the trial court committed prejudicial error when it refused to give appellant's requested instruction in the form of CALJIC No. 17.01,[2] which would have told the jury that it had to agree unanimously on the act or acts committed by the appellant before he could be found guilty. We accept this contention and reverse the judgment.

## The Facts

On the evening of February 18, 1981, the guest of honor at a farewell party, Kim E., and the victim, Lisa P., left the party and went to a neighborhood bar. They stayed at the bar until near closing time, when they went to the parking lot to get into their respective automobiles. A group of motorcyclists, who had been in the bar, were gathered in the parking lot.

Kim was forced onto the back of a motorcycle, which was driven away. Lisa did not know that her friend had gone against her will. When the motorcycle stopped at a signal light a few blocks away, Kim jumped off and ran back to the parking lot.

Lisa asked the motorcyclists where Kim had gone. The cyclists told her that her friend was going to their "clubhouse" and told her she could meet her friend there. Lisa, accompanied by one of the cyclists, then drove to the clubhouse. She waited in the parking lot until a member of the club told her that he was going to turn out the outer lights. She entered the clubhouse and, reassured her friend would be along soon, waited inside.

Lisa and appellant sat on the couch. Appellant was attempting to become a member of the motorcycle club and was known as "Prospect." After some conversation with appellant, Lisa decided that Kim wasn't going to come and began to leave. In an apparently nonthreatening manner, appellant said he wouldn't leave if he were her. But Lisa decided to go, and appellant did not try to stop her.

Lisa went out to her car, but was followed by another club member, later identified as Jim Mott. Mott opened the car door and assaulted her. He beat her up, removed her pants and then tried to rape her.

Mott pushed Lisa back into the clubhouse. She pleaded with the 10 to 20 people in the clubhouse to help her, but no one stopped Mott. He forced

---

[2]CALJIC No. 17.01 (4th ed. 1979) reads: "The defendant is charged with the offense of _____. He may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of such acts, but in order to find the defendant guilty, all the jurors must agree that he committed the same act or acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict." All CALJIC instructions referred to are from the fourth edition (1979) unless otherwise noted.

her into a back room, beat her some more, forced her to orally copulate him and then raped her. He left the room.

When Lisa tried to leave, another club member, Louis Vasquez, also forced her to copulate him orally and raped her. After Vasquez left, a succession of five to eight others came in and raped her.

During the victim's ordeal, appellant came into the room and told Lisa to calm down and quit crying. He left the room to get "permission" to talk with her. He returned, saying he could not speak with her. Lisa noticed that appellant wore the belt from some slacks she had in her car.

Before allowing Lisa to leave, some club members returned her jeans but the pant legs had been cut off. Lisa then left the building. Appellant approached as she was leaving and grabbed her blouse. He told her to unbutton it. Some other person told him "that's enough." Appellant then told Lisa she would be "a damned fool to go to the man."

Lisa drove to her mother's house and reported the rape. The police were notified, and she was taken to a hospital for an examination.

Lisa identified Mott and Vasquez as the men who raped her. She apparently forgot about appellant until she saw him in the audience at Mott and Vasquez' preliminary hearing seven months later on September 4, 1981. Appellant was arrested outside and told that the charge against him was "conspiracy to commit rape." Appellant waived his *Miranda* rights and agreed to talk with Investigator Anderson. Appellant's story about the events of February 19 generally coincided with Lisa's, but he claimed that she "strutted around" when she reentered the clubhouse with Mott, and he believed her sexual acts were consensual. Appellant denied threatening or having sex with Lisa. Appellant said he was a friend of Mott but not of Vasquez. When Investigator Anderson asked appellant why he had come to Mott and Vasquez' preliminary hearing, appellant said he came to support Mott. Later, he said that he had come to court because he planned to get married, and he wanted to ask Mott to be his best man.

Appellant did not testify at the trial.

### Discussion

Appellant was not prosecuted as a principal in the commission of the rapes and oral copulations by Mott and Vasquez. Appellant was only charged and tried as an accessory *after the fact* to the crimes committed by Mott and Vasquez, i.e., that he intentionally aided Mott and Vasquez in their efforts

to avoid prosecution and conviction for the felonies they had committed against Lisa.[3]

The prosecution's case against appellant consisted basically of three separate acts by appellant which arguably may be construed as aiding Mott and Vasquez to escape successful prosecution for their crimes:

(1) Appellant's statement to Lisa at the crime scene on February 19 that she would be "a damned fool to go to the man." According to the prosecution, this should be construed as an effort by appellant to discourage Lisa from reporting the crimes to the police.

(2) Appellant's appearance at Mott and Vasquez' preliminary hearing on September 4 to support Mott in his defense of the charges and inferentially to intimidate Lisa during her testimony.

(3) Appellant's statements to Investigator Anderson on September 4 after his arrest where he supposedly lied to Anderson about Lisa's consent to the sexual acts with Mott and Vasquez on February 19.

Without deciding the sufficiency of this evidence to support appellant's conviction, we will assume that each of the three acts by appellant supports a jury finding that appellant intentionally sought to aid Mott and Vasquez to escape prosecution and conviction for their crimes.

### Duty to Give Requested CALJIC Instruction No. 17.01

■ " 'If a defendant has been prosecuted for violation of a statute under which any one of several different acts could constitute the offense, the jury *must be told* that a verdict of guilty must be supported by a unanimous finding that one of the acts was committed.' " (*People* v. *Ewing* (1977) 72 Cal.App.3d 714, 717 [140 Cal.Rptr. 299] citing *People* v. *Heideman* (1976) 58 Cal.App.3d 321, 333 [130 Cal.Rptr. 349], italics added.) *Ewing,* of course, recognizes that other statutes, in contrast, may be violated by a continuous course of conduct or by a series of acts over a period of time such as contributing to the delinquency of a minor. (72 Cal.App.3d at p. 717.)

---

[3]Mott and Vasquez were charged with multiple counts of rape and oral copulation. Appellant, however, was tried first, and after his conviction of being an accessory after the fact, the charges against Mott and Vasquez were dismissed apparently due to the victim's refusal to testify further. The dismissal of the charges against the principals has no effect on appellant's conviction (see Pen. Code, § 972).

(Appellant was also charged with and tried for false imprisonment. The jury acquitted him of this charge.)

In *People* v. *Madden* (1981) 116 Cal.App.3d 212, 218 [171 Cal.Rptr. 897], this court held: "Conceptually, the exception of continuous conduct resulting in but one offense is quite limited. There is a fundamental difference between a continuous crime spree and continuous conduct resulting in one specific offense. The continuous conduct exception only really applies, if at all, to those types of offenses where the statute defining the crime may be interpretated as applying, on occasion, to an offense which may be continuous in nature such as failure to provide, child abuse, contributing to the delinquency of a minor, driving under the influence and the like [citations]."

The Supreme Court has given guidance on the question as to when a defendant is entitled to an instruction like CALJIC No. 17.01. In *People* v. *Diedrich* (1982) 31 Cal.3d 263 [182 Cal.Rptr. 354, 643 P.2d 971], the defendant was charged and convicted of two counts of bribery. Under count I, the prosecution offered evidence of two separate violations of Penal Code section 165 "under the umbrella of the single count." The trial court refused a requested jury instruction requiring the jury to agree unanimously on a single, specific act of bribery as the basis for the conviction under count I. At page 281 the court states: "There simply is no escape from the fact that two separate violations of [Pen. Code] section 165 were proved under the umbrella of count I and that at no point was the prosecution required to elect between the two violations; nor was the jury instructed that it had to find unanimously that [the defendant] had committed at least one of them. As we said in the seminal case of *People* v. *Castro, supra,* 133 Cal. at page 13 [65 P. 13]: 'The state, at the commencement of the trial, should have been required to select the particular act upon which it relied to make good the allegation of the information. This was not done; and even conceding that the failure to make such election at that time did not constitute error because of the want of demand upon the part of the defendant to make the election, still, when the case went to the jury, the court, in some form, should have directed their minds to the particular act of intercourse which it was incumbent upon the state to establish by the evidence, before a verdict of guilty could be returned against the defendant. This was not done.' [Citation.] *The reasons for requiring jury unanimity on at least one particular crime shown by the evidence are too obvious to require another restatement.* [Citation.]" (Italics added.)

Although the Supreme Court recognized the "continuous conduct exception," it limited the exception to those cases where the two or more criminal acts are closely connected in time so that they form part of one transaction or the crime is the type of offense which *in itself* consists of a continuous course of conduct such as pandering, child abuse or contributing to the delinquency of a minor. (*Id.,* at pp. 281-282.)

 The "continuous conduct exception" is inapplicable to this case for several reasons: First, the acts involved are not so temporally linked that they form one transaction; second, being an accessory after the fact is not the kind of offense which, in itself, consists of a continuous course of conduct; and finally, the Supreme Court has refused to consider analogous crimes that involve preliminary steps leading up to the real evil the law seeks to prevent—here, frustration of a criminal prosecution—as within the continuous conduct exception. (See *People* v. *Diedrich, supra,* 31 Cal.3d 263 at pp. 281-282 discussing Pen. Code, § 274 [abortion] and § 165 [bribery of a public official].)

Another point should be emphasized in the present case. The prosecution argued that appellant's statements made after his arrest were "further evidence of his involvement in trying to help Jimmy Mott escape conviction." Appellant's counsel then requested a limiting instruction "that [the postarrest statements themselves do] not constitute the crime charged, that the crime charged is only relating to the events of February 18 and 19, 1981, and not any subsequent acts . . . ." In essence, this was a request for a reading of CALJIC No. 4.71.5 or its equivalent.[4] The request was denied, as the trial court accepted the prosecutor's representation that evidence of assertions to law enforcement personnel could constitute the crime of accessory after the fact and that the date in the information referred only to the time of the rape, not to appellant's acts as an "accessory."

There are two facets to the error involved here, both described in many of the same cases. (1) When a jury is given more than one factual basis which might constitute the crime charged, it must be instructed along the lines of CALJIC No. 17.01. The jury must unanimously convict for the same act or actions. (2) As noted in *People* v. *Diedrich,* quoted above, the prosecution should have been required to "select the particular act upon which it relied to make good the allegation in the information." Failing to do so at the beginning was error, but could have easily been cured by instructing the jury in the form of CALJIC No. 4.71.5 (4th ed. 1982 pocket pt.) when appellant's counsel requested a limiting instruction, or even when the case was submitted to the jury.

---

[4]CALJIC No. 4.71.5 (4th ed. 1982 pocket pt.) reads:
"Defendant is charged in [Count ＿＿＿＿＿＿of] the information with the commission of the crime of ＿＿＿＿＿＿, a violation of section ＿＿＿＿＿＿of the Penal Code, on or about a period of time between ＿＿＿＿＿＿and ＿＿＿＿＿＿.
"In order to find the defendant guilty, it is necessary for the prosecution to prove beyond a reasonable doubt the commission of a specific act [or acts] constituting said crime within the period alleged.
"And, in order to find the defendant guilty, you must unanimously agree upon the commission of the same specific act [or acts] constituting said crime within the period alleged.
"It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

This doctrine of "election" is based on the same cases and principles as the doctrine requiring an instruction on jury unanimity. ■ Generally, when no election is made, it is assumed that the first offense upon which evidence was introduced is the one selected. (*People* v. *Epps* (1981) 122 Cal.App.3d 691, 702 [176 Cal.Rptr. 332]; *People* v. *Madden, supra,* 116 Cal.App.3d 212, 217.) But *the jury must be informed* of this presumption so that it knows which act or acts are being prosecuted. (*People* v. *Epps, supra,* 122 Cal.App.3d 691, 702; *People* v. *Alva* (1979) 90 Cal.App.3d 418, 424 [153 Cal.Rptr. 644].)

■ Here, the prosecution did not make an election at any time and opposed appellant's request for instructions that would have cured the error. Opinions differ on whether a reading of CALJIC No. 17.01 alone will cure the failure to elect a specific crime. (Compare *People* v. *Gitchuway* (1983) 146 Cal.App.3d 432, 437-438 [194 Cal.Rptr. 141] [jury unanimity instruction does not put a defendant on adequate notice of the crime to be tried] with *People* v. *Dunnahoo* (1984) 152 Cal.App.3d 561, 572 [199 Cal.Rptr. 796] [criticizing *Gitchuway, supra,* as a "departure" from accepted rationales that require either an election or an instruction like CALJIC No. 17.01 on jury unanimity].) We need not decide this issue. Both election and CALJIC No. 17.01 were requested and refused. Both refusals were error.

*People* v. *Bailey* (1961) 55 Cal.2d 514, 519 [11 Cal.Rptr. 543, 360 P.2d 39], cited by the dissent, is inapposite. *Bailey* allows cumulation of many small thefts to establish a grand theft. This may be done when the acts are part of "one intention, one general impulse, and one plan." The present case is not such a "cumulation" case; the offense is not elevated to some higher category of crime by showing that appellant's various acts somehow add up to a greater crime. The single *objective* may be assumed—aiding appellant's associates in avoiding conviction for their crimes. The problem is that the multiple acts shown provide multiple evidentiary foundations for the verdict. The law requires that the jury must be so charged that its verdict has one basis.

■ ■■■ *The Error Was Prejudicial*
*Under Chapman v. California*[5]

■ After holding the trial court's refusal of CALJIC No. 17.01 constituted error, the Supreme Court in *People* v. *Diedrich, supra,* then ad-

---

[5]As explained in *People* v. *Deletto* (1983) 147 Cal.App.3d 458, 472 [195 Cal.Rptr. 233], the instruction (CALJIC No. 17.01) focuses the jury's attention on a specific act and requires the jury to determine guilt *as to that act* beyond a reasonable doubt. "The instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one

dressed the prejudicial effect of the error: "The next question is whether the error was prejudicial. We feel bound to hold that it was. *This is not a case where the jury's verdict implies that it did not believe the only defense offered.* Diedrich's defenses differed: As far as the Jolly Fox offer is concerned, it consisted of a simple denial. The Remington transactions were 'explained.' Having in mind that the proof of the Jolly Fox offer depended, essentially, on the testimony of a single immunized witness and that the proof of bribery via the Remington transaction was somewhat circumstantial, we feel bound to conclude that the error was prejudicial." (31 Cal.3d at pp. 282-283, italics added.)

In the present case, it cannot be said that the jury's verdict necessarily implied that it rejected the only defense offered. Although appellant did not testify, his admissions to Investigator Anderson seven months after the rapes occurred was introduced by the prosecution as "further evidence of [appellant's] involvement in trying to help Jimmy Mott escape conviction." This evidence shows appellant's defense to the first act offered by the prosecution, the victim would be foolish to talk to "the man," was a denial that appellant had made any threats to the victim. Appellant stated that he merely intended to comfort Lisa and to be supportive. Appellant's defense to the second act offered by the prosecution, his appearance at the Mott-Vasquez preliminary, was an *explanation* for his presence at the hearing and not a denial. (Cf. *People* v. *Diedrich, supra,* 31 Cal.3d at pp. 282-283.) Appellant's defense to the third act, the allegedly false statements to Investigator Anderson that the victim had consented to the rape, was an implied denial that the victim had been forced into the sex acts. These statements, however, were made in response to Investigator Anderson's advice to appellant that he was being charged with "conspiracy to commit rape." Thus, appellant's statements, assuming them to be false, could have been made only for the purpose of defending himself from the rape charge and not to help Mott and Vasquez escape prosecution. ■ An essential element of being an accessory after the fact is the *specific intent* to aid the principal to avoid or escape arrest, trial, conviction or punishment. (Pen. Code, § 32; *People* v. *Duty* (1969) 269 Cal.App.2d 97, 100-101 [74 Cal.Rptr. 606].) This specific intent must be present at the time of the act which is the basis for the crime charged and must be proved beyond a reasonable doubt. ■ Since appellant's conduct and statements to Lisa and Investigator Anderson were equivocal and subject to different meanings, it cannot be said with any de-

---

count." (*Id.,* at p. 472, italics original.) The failure to instruct when required goes to the defendant's fundamental right to a jury trial and due process and must be evaluated under the standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].

gree of certainty that the jury necessarily rejected appellant's only defense to the charge.[6]

The case was rife with the possibility of different findings by the jurors which, without CALJIC No. 17.01 and without an election by the prosecution, deprived appellant of the right to have the jury agree unanimously on the criminal act or acts which supported his conviction. Appellant did not receive the full benefit of the presumption of innocence and the requirement that the prosecution prove that he committed the crime charged beyond a reasonable doubt.

The judgment is reversed.

Andreen, J., concurred.

**WOOLPERT, J.**—I respectfully dissent.

In this case the CALJIC No. 17.01 instruction should have been given if for no reason other than when in doubt, it is usually harmless to give it and may avoid reversal. However, I disagree with the majority conclusion that reversal is required because of its absence. Initially, the evidence and arguments presented at trial did not mandate a 17.01 instruction. First, the "other acts" evidence went to the question of defendant's intent, not his commission of separate and distinct criminal acts. Second, if indeed attendance at the Mott and Vasquez preliminary hearing and statement to Investigator Anderson constituted separate felonies, then those repeat crimes fell under the "continuous conduct exception" to the requirement of giving CALJIC No. 17.01. Finally, even if the trial court was required to give CALJIC No. 17.01, its absence here did not prejudice defendant.

Before addressing the instructional issue I note my concurrence with the majority that the dismissal of charges against Mott and Vasquez did not invalidate the completed trial and conviction of appellant. Penal Code section 972 survives defendant's due process challenge. Also, more pragmatic observations support defendant's conviction.

---

[6]The dissent contends there was only one defense—denial. This is not the case. As we have explained, appellant did not deny making the statements to Investigator Anderson. His defense there was an explanation—asserting the truth of the statement made. His appearance at the preliminary hearing is also defended by explanation. It is true that his defense on one element of the crime—there was a rape at all—was a denial. The jury did not accept this part of his defense. But this fact is irrelevant to the issue here. Appellant was not contending that he was not present when the rapes allegedly occurred, his contention was that events could be interpreted differently. The jury could easily believe the victim's version of the rape itself in every detail, but not accept her description of the threat appellant made the next day. These were distinct events. Appellant's denial that there was a threat is independent of his denial that there was a rape.

However purposeful, the three defendants below outmaneuvered the prosecution with "Onion Field" type pretrial moves. The appellant was last to be arrested, the least involved defendant, yet the first to be tried. Over protest by the district attorney, the court severed the previously combined trials. Appellant announced he was willing to go to trial while the two far more serious offenders sought and received a continuance which the prosecution unsuccessfully opposed.

During the prosecution of appellant, the victim was required to undergo an extraordinary number of hours of demanding testimony of an exceptionally sordid and demeaning character. Because of her condition at the time of the events, as well as the number of acts involved, the jury accepted the conflicts between her pretrial and trial testimony. The mixing of the sequence of the events and participants concerned the crimes committed by the other defendants. When it came to the postassault threat, appearance at the preliminary hearing and statement to the investigator, the evidence was clear and presented the jury two versions, one clearly pointing to guilt and the other to innocence. The jurors, having found the victim to be credible, faced only one task: To determine whether there had been a false imprisonment as well as the threat. The result was entirely consistent with all parts of the victim's testimony.

The majority reversed in this case because of the trial court's refusal to give the CALJIC No. 17.01 instruction. See *People* v. *Bottger* (1983) 142 Cal.App.3d 974, 983-984 [191 Cal.Rptr. 408], in which the result is probably incompatible with the result in this case.

Attorneys, judges and jurors alike will acquiesce in the general proposition that all 12 jurors must agree upon the ultimate facts which overcome reasonable doubt. However, when the testimony is of acts disconnected in time, and sometimes in place, the "CALJIC No. 17.01 Problem" arises. Is the instruction required to remind the jurors of a principle which ordinarily seems obvious? Do we have a "continuous conduct" case? We are hearing far too many appeals in which this is the troublesome issue. Often in unpublished opinions we rationalize whether there was harmless error in not giving the instruction. The 1984 Annual Supplement to Shepard's California Citations discloses no other instruction is more often cited in published opinions.

After engaging in the typical mental gymnastics these cases require, I conclude the jurors could not have divided in believing which act or acts constituted the crime. Therefore, assuming the instruction should have been given, the failure to do so was harmless error beyond a reasonable doubt.

(Cf. *People* v. *Deletto* (1983) 147 Cal.App.3d 458, 465-475 [195 Cal.Rptr. 233].)

In *People* v. *Diedrich* (1982) 31 Cal.3d 263, 281 [182 Cal.Rptr. 354, 643 P.2d 971], the court, in noting the failure of the prosecution to elect between separate violations, and the need for unanimous approval of the crime selected, added: "There simply is no escape from the fact that two separate violations of [Pen. Code] section 165 were proved under the umbrella of count I . . . ." Herein lies the problem for trial judges. When is a crime completed? When are pieces of evidence mere evidence of an overall crime rather than of individual crimes charged under one umbrella? Does an information charging one crime committed on or about a certain date make all continuing criminal activity on remote dates separate, uncharged crimes?

It appears the trial court resolved the above questions on the basis that defendant was charged with a single crime against the same person (the state) and the proof was of a course of conduct which provided sufficient evidence of the necessary intent. " 'The test of an accessory after the fact is that, he renders his principal some personal help to elude punishment,— the kind of help being unimportant.' (1 Bishop's Criminal Law, 500, § 695.)" (*People* v. *Duty* (1969) 269 Cal.App.2d 97, 104 [74 Cal.Rptr. 606].) Also, "[i]n determining the knowledge and intent of the aider, the jury may consider such factors as his possible presence at the crime or other means of knowledge of its commission, as well as his companionship and relationship with the principal before and after the offense." (*Ibid.*)

Thus the conduct is that of protection, the purpose of which may be revealed only by a study of the acts performed. One act may be of doubtful significance and a second may be necessary to qualify the first. It is in that sense in which the case was tried and argued.

Because of the uncertain, open-ended character of the crime charged, it is not surprising that the trial court rejected the instruction. However, the refusal was dangerous and unnecessary. The instruction would have enlightened the jury, if nothing else. No confusion would have arisen in this case if the jury had been so instructed.

Penal Code section 654 cases use analogous legal concepts to avoid multiple punishment for conduct directed to a single objective. It has been held that Penal Code section 266h, prohibiting pimping, relates to continuous criminal activity. For example, four counts were limited to the "single offense of pimping." (*People* v. *Lewis* (1978) 77 Cal.App.3d 455, 461 [143 Cal.Rptr. 587, 3 A.L.R.4th 1185].) The court noted an analogous line of theft cases which reached a similar conclusion that when the objective of

numerous small thefts was to obtain money or property pursuant to one plan, there was a single, greater crime. The observation was made that in the single crime case the jury is concerned with the end result rather than the means, an idea which may apply to the charge of harboring a fugitive or helping a friend avoid arrest and conviction. (*Ibid.*)

Would a grand theft analysis be a safe one to follow in deciding whether to give CALJIC No. 17.01? In *People* v. *Bailey* (1961) 55 Cal.2d 514 [11 Cal.Rptr. 543, 360 P.2d 39], the court was concerned with the cumulation of a series of thefts into the single crime charged of grand theft. "Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Id.*, at p. 519.)

The foregoing multiple conviction language lends support to the idea that repetitious activity which culminates in a legislatively declared prohibited status, or achieves the single objective of the offender, may be charged and proved as a single crime.

Having considerable doubt that this was ever a multiple crime prosecution, or that the jurors ever thought of it as such, the mere possibility of more than one violation having been presented the jurors requires discussion of the "continuous conduct exception" to the use of CALJIC No. 17.01. The "continuous conduct exception" relieves the court of the necessity to give No. 17.01 when two or more offenses occurred "so closely connected in time that they formed part of one transaction" or it was the "type of offense which, in itself, consists of a continuous course of conduct. [Citations.]" (*People* v. *Diedrich, supra,* 31 Cal.3d 263, 282.) The "continuous conduct exception" is limited and not favored. (*Ibid.; People* v. *Madden* (1981) 116 Cal.App.3d 212, 218 [171 Cal.Rptr. 897].)

The *Diedrich* opinion refers to *People* v. *Lowell* (1946) 77 Cal.App.2d 341 [175 Cal.Rptr. 846], for the "contributing" continuous conduct exception. In *Lowell* two boys were involved in sexual conduct which took place over three years. The court held that the district attorney could not be forced to elect as to the act on which to rely, nor need the jury be given a unanimity instruction as to any particular act. (*Id.*, at p. 347.) The apparent rationale was that the information did not charge the defendant with a specific sexual crime, but instead only with "contributing to delinquency."

It has been said that when "any one of several different acts could constitute the offense" a unanimity instruction must be given. (*People* v. *Ewing*

(1977) 72 Cal.App.3d 714, 717 [140 Cal.Rptr. 299].) In *Ewing,* a child abuse case (Pen. Code, § 273a), the court noted that the statute could be violated by a single act, or repetitive acts, as was true in the *Lowell* "contributing" case. Because the information charged the violation took place between two designated dates, "[t]he issue before the jury was whether the accused was guilty of the course of conduct, not whether he had committed a particular act on a particular day." (*People* v. *Ewing, supra,* at p. 717.)

Thus, in *Ewing* and *Lowell,* the jurors were permitted to disagree on which act or acts were proved. Therefore it was possible no act had been proved by the usual standard to the satisfaction of all jurors. Logic may question the legal position that proof which fails to establish the acts which are the basis of the charge may nevertheless sufficiently support the conviction. When only one criminal act is offered in evidence to prove the charge, it requires the usual standard of proof and unanimity. Why then, when charging numerous supporting acts, does the requirement of unanimity diminish?

If the "continuous conduct exception" has any justification, it should apply to this "avoiding prosecution" conduct which is directed to aiding another person to remain free from successful prosecution, and not to the specific act or acts which were intended to make that possible. Breaking down the "help" into its parts, the separate crime approach may become an instructional nightmare. When a mother helps her delinquent son escape arrest by hiding him during the day while he leaves at night to commit burglaries, is there a separate accessory-after-the-fact crime committed each time the son returns? Must the jurors unanimously agree that this happened over a period of days or must they all agree to particular days? Would the result be different if the son stayed away for several days before returning or his mother took him elsewhere to hide? Would the significant cutoff date be the son's apprehension or the cessation of the mother's help? Should the information charge numerous counts or just one count alleging either "on or about" or "between _____ and _____"? In the comparable child abuse cases the answer has been the "continuous conduct exception."

In *People* v. *Diedrich, supra,* 31 Cal.3d 263, after rejecting application of the "continuous conduct exception," the court considered whether the failure to give CALJIC No. 17.01 was prejudicial error, saying: "We feel bound to hold that it was. This is not a case where the jury's verdict implies that it did not believe the only defense offered. Diedrich's defenses differed: . . ." (*Id.,* at p. 283.) Here the only defense was that the victim was lying to cover her sexual abberations which would embarrass her if she did not lie. The jury heard the sordid account of a prolonged sexual assault on a stranger in an unfamiliar setting under unusual circumstances. The victim

did not await rumor of her sexual proclivities, but instead immediately reported the crime and stood ready to be an embarrassed witness in whatever the law would require of her.

The defense wasted much time trying to show there was a potential avenue of escape. Also, assertions were made that she paraded in the nude within the sight of the club members, a version directly conflicting with her account of being assaulted in her car and pushed naked into the building. The jurors carefully asked for a rereading of testimony relating to a false imprisonment count and acquitted defendant on that charge. This is consistent with the victim's testimony of defendant appearing to be a mere "prospect" striking for membership in the club and not able to help her resist the sexual assaults which the jury unanimously agreed took place. The threat made in the presence of club members as the victim left was consistent with that role of trying to make a favorable impression on his friends. Only the victim testified to the threat; the contrary evidence came before the jury only as a part of defendant's statement to the investigator. Either the victim was to be believed or, through the investigator, the defense version would prevail. It is inconceivable that the jurors were able to unanimously agree on the underlying felonies, and then would have to put together split votes on the subsequent conduct.

Receiving CALJIC No. 2.91, the jurors were instructed that "[t]he burden is on the State to prove beyond a reasonable doubt that the defendant is the person who committed the offense with which he is charged." The information was read to the jury. Count two alleged the offense took place on or about February 19, 1981, the day of the threat. No charge was made in reference to the events much later when defendant talked to the investigator. The verdict of guilty ended with these words: "as charged in Count Two of the Information filed herein."

If there was no direct instruction on the effect of the statement to the investigator, there was one which should have kept the jurors from splitting votes. The jurors, under CALJIC No. 2.03, were instructed: "If you find that before this trial the defendant made false or deliberately misleading statements concerning the charge upon which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt but it is not sufficient of itself to prove guilt." The average juror would understand this to mean that the statement was not to be isolated from the other proof of the threat. If so understood, the two significant acts would stand or fall together.

Defendant's appearance at the other defendants' preliminary hearing prompted his arrest. His presence at the hearing supported the verdict only

as a part of defendant's "companionship and relationship with the principal before and after the offense." (*People* v. *Duty, supra,* 269 Cal.App.2d 97, 104.) The prosecutor, even in her most energetic and imaginative moments, did not suggest that attending a friend's preliminary hearing constituted a separate crime.

We should not speculate that the jurors, in whole or in part, considered the subsequent events other than as mere confirmatory evidence of intent. If we must speculate, we should assume that all of the jurors heard and applied the foregoing instructions and meant what they said in their verdict.

Finding defendant's additional appellate contentions without merit, I would affirm the judgment.