Filed 8/6/13  P. v. Frazier CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>HENRY LEE FRAZIER, JR.,<br><br>Defendant and Appellant. | F062053<br><br>(Tuolumne Super. Ct.<br>No. CRF31263)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  Eleanor Provost, Judge.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Barton Bowers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# I.

## INTRODUCTION

This case arises from a construction dispute. A homeowner testified that defendant did not competently complete portions of a construction contract for which he was paid. Defendant testified that the homeowner improperly used his contractor's license without his knowledge, refused to provide him with construction plans and mischaracterized his role in the project. Defendant also denied diverting any funds.

Defendant was convicted of felony diversion of construction funds. (Count I – Pen. Code,[1] § 484b.) After sentencing, the Attorney General moved the trial court to revoke defendant's contractor's license. (See Bus. & Prof., §§ 7090, 7106.) The trial court granted the motion.

The applicable version of section 484b distinguished between felony and misdemeanor violations based on whether the defendant diverted funds "in excess of $1,000." Defendant contends that the court was required to submit to the jury the issue of whether the diverted funds were "in excess of $1,000," and that its failure to do so was error. (See *Apprendi v. New Jersey* (2000) 530 U.S. 466, 489 (*Apprendi*).) We agree, but find the error harmless beyond a reasonable doubt. (See *People v. Sengpadychith* (2001) 26 Cal.4th 316, 324-326 [*Chapman*[2] standard applies].)

The evidence at trial suggested that defendant committed more than one discrete violation of section 484b, yet only one count was charged. The trial court did not issue a unanimity instruction, and defendant contends this was error. We agree. We are unable to conclude that this error was harmless beyond a reasonable doubt, and therefore reverse.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*)

2.

Defendant also contends that the manner in which the court revoked his contractor's license violated his right to due process. Because we reverse the conviction on which it was based, we reverse the revocation order without reaching the due process contention.

## II.

## FACTS

The complaint in this case charged defendant with one felony count of diversion of construction funds. (§ 484b.) The complaint did not indicate the amount of funds defendant was alleged to have diverted.

At defendant's trial, the following evidence was adduced.

Joel Johnson's Testimony

Defendant's brother, Anthony Frazier, is an architect. In 2007 or 2008, Anthony created plans for a bedroom expansion at the home of Joel and Doris "Gail" Johnson. The plans also included work on the front entryway of the home. Anthony recommended that Joel hire defendant to perform work on the project.

Defendant's company, Bay West Development, was listed on the plans, as was Anthony Frazier's contractor's license number. Eventually, defendant came out to the Johnson home to look at the site. He returned some time later with a budget sheet. Joel and defendant agreed on a contract price of $60,000.00.

On July 16, 2008, Joel and defendant signed a contract, which was admitted into evidence. The total amount the Johnsons owed under the contract was $64,135. After listing the total amount, the contract states: "INSTALLMENTS AS FOLLOWS: 21,378.35 <START> 21,378.35 <ROOF COVER> 21,378.35 <FINAL INSPECTION>"[3]

---

[3] The phrase "INSTALLMENTS AS FOLLOWS" was printed and the remainder of the quoted text was handwritten.

Eventually, defendant started work on the project. The yard was leveled, and trenches were dug for the foundation work.

Partway through the work, a number of difficulties arose. First, a plan change was required to accommodate tree roots in the mineral soil. No change was made to the contract with respect to this plan change.

It was also discovered that the plans did not reflect anticipated foundation work, requiring an additional permit.

During the project, defendant approached Joel about using Styrofoam concrete forms instead of insulated concrete forms. Defendant indicated that the Styrofoam forms would be more expensive, but would save on labor costs. Joel told defendant to do whatever he thought best. Styrofoam forms were ultimately used and passed inspection by the county.

At one point, Joel and defendant met to talk about additional payments for windows, engineering and redrafting fees. Defendant told Joel that the first installment payment had been spent and that he needed the second installment payment "to get the concrete poured" and "order all the windows and materials." Joel believed that this would be "straying" from the contract, because the second payment was not due until the sheeting, framing and roof trusses were up.

Joel ultimately wrote a check for $3,800 to "Baywest [*sic*] Development" for "architectural changes" and gave it to defendant. Additionally, Joel provided his credit card number so that defendant could purchase windows. The amount charged for the windows was $3,500. No windows were ever delivered to Joel's house.

Eventually, foundation concrete was poured for a single slab at the front entry of the house. After the pour, defendant did no further work on the Johnson project.

"At some time" defendant offered to finish the job on a "time and materials basis." Joel understood this to mean that defendant would simply bill for hourly wages and materials without regard to the contract. Joel made a complaint to the Contractors State

4.

License Board (CSLB). He eventually had another contractor perform the remaining work.

Testimony of Donald Bruce, Jr.

Donald Bruce, Jr. (Bruce) works for the CSLB. Bruce was assigned to the Johnsons' complaint against defendant. Bruce testified that defendant did hold valid contractor's licenses. Under the name "Bay West Electric, Incorporated," he held a general contractor's license (Class B) and a C-10 electrician license. He testified that because Bay West Electric held the license, and not Bay West Development, "that would force the … state to recognize Bay West Development was not licensed at the time." This was referred to as a contractor "working out of name style."

Bruce spoke with defendant on April 1, 2009. Defendant told Bruce that he was the contractor for the work at the Johnson home. He admitted receiving $42,000 from the Johnsons. He said that he believed the contract could still be completed. Defendant told Bruce that he stopped the work because he had not received revised plans and had no money to complete the project.

Testimony of Michael Dewald

Michael Dewald was a licensed contractor. H.C.C. Surety Group hired Dewald to conduct an investigation at the Johnson site. Dewald investigated the site in July 2009. He determined that the following had been done on the project: the foundation had been installed; mud sills had been installed loosely, but were not completely installed; and some of the drain pipe had been laid out but was not completely installed. Dewald testified that the work that had been done failed to meet industry standards in a number of respects. There were holddown brackets and seismic straps on site that had not been installed. Dewald did not see S.S.T.B. bolts, which must be in place when the foundation is poured. The mud sills were not properly aligned. Dewald did not see flashing to separate the concrete from the wood framing, and concrete had poured directly up against wood siding.

5.

Dewald determined that 18 percent of the entire project had been completed. Given the work that had been completed, Dewald testified that of the $42,000 the Johnsons had paid to defendant, there should have been "no less" than $30,000 left.

Testimony of Donn Marinovich

Donn Marinovich was a licensed general contractor who performed inspections for the CSLB. The CSLB asked Marinovich to inspect the Johnson site. Marinovich inspected the site twice, on May 7 and 14 of 2009. During the May 7, 2009, inspection, Marinovich observed a "great deal" of discrepancies between what the plans called for and what had been built. For example, the plans called for an "inverted T, poured-in-place foundation," but instead an insulated concrete foundation had been used. Wood remained beneath the forms, incorrect washers were used, and seismic hold downs on site were not installed. Dewald also found wood forms embedded in the concrete, which can promote termite infestation and dry rot. To fix this particular issue, the wood forms would need to be torn out.

The CSLB asked Marinovich to value the work that had been performed on the Johnson project. Marinovich valued the work that had been done at $4,408.

Testimony of Eileen Hoover

Eileen Hoover was a general manager for Calaveras Lumber since 2002. On November 8, 2007, defendant opened an account at Calaveras Lumber under the name, "Bay West Electric." The only project associated with this account was the Johnson project. The items purchased through credit on the account included: rebar, levels, chalking tape, framing, Douglas Fir studs (2x4x8 and 2x4x10), nuts, and bolts. When asked whether these materials were "basically foundation and framing type" materials, she responded, "Correct." The outstanding principal on the account was $2,685.97. A

single payment was made in June 2008 of $262.  The account was credited $396.69[4] for materials Calaveras Lumber picked up from the Johnson site on July 6, 2009, including 18 pieces of rebar, foundation bolts, soap washers, hex bolts, and miscellaneous foundation materials.  Defendant's account was placed on hold in late 2008 or early 2009 due to lack of payment.

Testimony of Defendant Henry Lee Frazier, Jr.

Defendant received a C-10 electrician's license in 1984 and a class B general contractor's license in 2005.  He created Bay West Development in May 2005. Defendant testified that his brother Anthony was never "a part of" Bay West Development or Bay West Electric Company.  Defendant hired Anthony as an independent contractor.

Defendant testified that he was initially only involved in "designing and drafting services" for the Johnson project.  After the design and drafting services were completed on December 31, 2007, defendant did not hear from the Johnsons again until July 16, 2008.

On December 31, 2007, the Johnsons attempted to obtain a permit for the project. Neither Anthony nor Joel spoke to defendant about the filing of the permit.  Defendant did not give Anthony or the Johnsons permission to use Bay West Electric, Incorporated's contractor's license number on the permit.

A second permit, dated June 27, 2008, was issued with respect to the project. Defendant was not made aware of this permit either, until after the foundation was completed.  Bay West Electric's contractor's license number was used on the second permit.  Defendant did not give Anthony or Joel permission to file the second permit.

---

[4] On cross-examination, Hoover indicated that the credit was $366.46 pretax and $496.69 after tax.

7.

In early July 2008, one of the Johnsons called defendant, and asked that defendant come to their home and provide an estimate on the plans Bay West Development had previously created. Defendant met with Anthony, Joel and Gail at the Johnson home. Defendant said that he could not do the job as a contractor because he lived too far away. The Johnsons asked whether defendant could be the project manager of the job and perform the electrical work involved. Defendant decided that he would become project manager and do the electrical work. Defendant formulated a "target amount" of $64,000 for the job. He arrived at this figure based on the first set of Anthony's plans, which called for a "the extension of two rooms, the bump-out of [] two windows up on the second level and a relocation of the laundry [room]."

Defendant indicated that a man named Walter Hill submitted an estimate of $7,450 to do the foundation work on the job. Joel hired Hill to do the foundation work. Defendant wrote the check to pay Hill, which was drawn on funds from the first installment payment Johnson had made to defendant.

Hill recommended using an "isolated block system" for the foundation. Installing this system requires a special certification, which Hill had. Defendant testified that a labor-intensive excavation was required for this type of foundation. In such a project, most of the labor is at the front-end.

Defendant also testified to significant problems that arose during the project. A subsurface tree trunk was discovered when it was hit with a back hoe. Defendant testified that the tree trunk "plagued" the crew throughout the whole job. For three or four days, they attempted to remove the tree trunk. They could not continue with the work on the project until the trunk was removed. Defendant testified that he was not working as the contractor for the project, but rather as the project manager on behalf of Joel. If defendant had been the contractor, he would have stopped the job upon discovery of the tree trunk, written a change order, and made a new contract.

Eventually, defendant began to run low on money due to the amount of labor required. He testified that the first installment Johnson had paid him was used in obtaining the isolated block system for the foundation. Defendant had to travel to Nevada to pick up materials related to the isolated block system. Additionally, the labor costs associated with the excavation were substantial.

Defendant requested that Johnson provide the second installment payment. Defendant testified as to his understanding of the conditions for the second installment payment: "before the second payment is given, that the frame of the roof must be on the building. That was our goal." Defendant admitted that the condition was not satisfied before he received the second installment payment.

Eventually, Joel fired Hill. When this occurred, defendant was unsure how to proceed because Hill had possessed the certification required to install the isolated block system. Hill told defendant about another certified installer, Malcolm Millright. Defendant called Millright, who offered guidance to defendant on how the system was installed, free of charge. Once the isolated block system was installed, it required special braces to hold the blocks into position during the concrete pour. Millright charged $20 per unit to rent the braces.

On September 24, 2008, Joel indicated to defendant "for the very first time" that he wanted to extend the foundation 113 feet. This extension would require additional excavation which would need to be performed by hand. It took four men two or three weeks to perform the task with picks and shovels. Defendant told Joel that he needed to resubmit plans to the city to reflect the change.

Millright indicated that defendant needed to retrench the project again. The trenches needed to be two feet deeper than they were. The retrenching took a couple of weeks. Next, they vacuumed to remove loose dirt in preparation for the pouring of concrete. The vacuuming took approximately one week.

Defendant continued to ask for revised plans. They were never given to him.

Eventually, a government inspector came to the site and said, "[W]e're ready for pour." At that point, "everybody" became anxious to have the concrete poured. Defendant said that he could not pour the concrete until he received the revised plans for which he had been asking. Without them, he did not know where the "hold downs" were to be installed. Joel insisted that the concrete be poured. So, defendant had the concrete poured.

After the concrete cured, defendant continued to ask Joel and Anthony for the revised plans. Defendant testified that they "purposefully" kept the plans from him. Work on the project ceased because it seemed to defendant that there was nothing more he could do.

Accounting

Defendant created a Wells Fargo bank account for Bay West Development in May of 2005, when the company was created. On July 16, 2008, a check from the Johnsons in the amount of $21,378.35 was deposited into the Bay West Development account. On August 20, 2008, another $21,378.35 deposit was made to the account. The Johnsons wrote a check to defendant for that same amount dated August 20, 2008. Defendant deposited a $3,800 check from Joel on September 26, 2008.

In July 2008, defendant made a $941.58 payment from the account for the isolated block materials for the foundation. Defendant testified that this was apparently the only debit on the account that related to the Johnson project. A $1,000 check dated July 23, 2008, and drawn on the Bay West Development account was deposited into a joint bank account defendant maintained with his wife. Checks in the amounts of $700, $1,000, $3,000, $1,000, and $2,400 drawn on the Bay West Development account and dated July 28, August 6, August 19, August 5 and September 27 of 2008, respectively, were also deposited into this joint account. Defendant later testified that these were equity draws. These amounts were in addition to the $1,650 per week payroll draws defendant received for the project.

10.

Between July 17, 2008, and September 30, 2008, defendant transferred $29,717.16 from the Bay West Development account to his other business account for Bay West Electric, Incorporated. Defendant testified that this entire amount was used for payroll payments for labor on the Johnson project. The last payment from the Bay West Development account related to expenses, costs or materials for the Johnson project was made on September 25, 2008.

Defendant also testified that he was unable to pay Calaveras Lumber because Joel "took" $3,500 out of defendant's account by reversing a charge.

Rebuttal Testimony of Joel Johnson

Joel testified that defendant was the contractor on the job. Joel testified that he did not hire or fire Hills. Joel testified that it was always his intention for the foundation to go two feet beyond what the initial plans indicated. He believed Anthony had made an error in failing to reflect it in the first plan.

The following exchange between defense counsel and Johnson took place on rebuttal:

"[Defense counsel]: Would you agree that the additional 113 square feet to the project was going to require some additional work and maybe some additional cost?

"[Joel Johnson]: Well, I assume that any change from the – what we thought before would be – yeah, would be a change order cost for sure."

Post Evidence Phase

During closing argument, the prosecutor argued two bases for finding defendant guilty:

"[T]he second element [of the offense] has two parts. The defendant willfully failed to apply such money for those purposes. Okay. He didn't apply the money to what he was supposed to do. *And that can be shown one of two ways. It's an either/or.* [¶] The first one is failing to complete improvements for which the funds were provided, or the second way is willfully failing to pay for services, labor, materials or equipment incident

11.

to the construction.  So, *if he does one of those two things*, and we've proved that beyond a reasonable doubt, then the defendant's guilty.  Well, we've proven the second element.  [¶]…[¶]  …Okay.  Number two, did he willfully fail to apply such money for those purposes by either failing to commit to complete the improvements or not – failing to pay for the services, labor and materials?  *Well, actually both of those*.  [¶]  *In this particular case, he didn't finish the job that he was paid to do, and he didn't pay for everything that he even got for the job from Calaveras Lumber*."  (Italics added.)

The trial court did not issue a unanimity instruction to the jury.  The jury convicted defendant, "as charged."

The trial court granted probation, but ordered defendant to serve 60 days in jail with a one-day credit for time served.  The court ordered defendant to pay restitution in the amount of $28,027.42 to Joel and Gail Johnson.  The court also ordered defendant to pay a restitution fine of $1,000 (§ 1202.4, subd. (b).)  An additional restitution fine of $1,000 was assessed and suspended pending termination of probation.  (§ 1202.44.)  The court further fined defendant $1,070.

Postsentencing Hearing

The Attorney General filed a motion with the trial court seeking to revoke defendant's contractor's license pursuant to section 23 and Business and Professions Code section 7106.  Defendant's attorney filed an opposition to the motion.

Defendant's attorney did not appear at the hearing.  The court asked defendant whether his attorney was coming, and defendant replied, "He's not here."  Defendant did not know whether his attorney made arrangements to appear telephonically.

Deputy Attorney General Jeff Phillips appeared on behalf of the Attorney General.

There was a discussion between the court, defendant and Phillips regarding service of defendant's opposition.  Phillips had not received the opposition, but that may have been due to Phillips's absence from his office.  The court conveyed the essence of defendant's opposition, in which he argued the superior court's revocation of his license would violate his "constitutional right to a license revocation hearing."  The court asked

12.

Phillips whether there was statutory authority for the superior court to revoke the license. Phillips responded by citing section 23.[5] Phillips went on to present argument regarding the burden of proof on a license revocation, in response to the court's questions.

At one point during this discussion, defendant tried to speak. The court said: "Mr. Frazier, you're not really in a position to represent yourself. You have a lawyer. He has filed moving papers. I've read them. Or opposition papers. I've read them. And they're – a motion like this doesn't require testimony, it doesn't take testimony, it doesn't anticipate testimony." Later in the hearing, defendant did speak at some length about the anticipated hearing before the CLSB.

The court granted the motion, stating to defendant, "You were convicted by a jury on a burden of proof of beyond a reasonable doubt that you've diverted construction funds, and I am going to grant this motion of the attorney general." At the end of the hearing, after the court made its ruling, the defendant stated, "I'm representing myself." The court responded, "No, you're not. You have a lawyer."

## ANALYSIS

### III.

### *APPRENDI* ERROR

Defendant claims that *Apprendi* error resulted in a constitutionally invalid sentence. The Attorney General does not contend that there was no *Apprendi* error. Rather, she argues that any such error was waived and was harmless. Defendant

---

[5] For guidance on remand, we note that section 23 does not grant the superior court the ability to suspend a professional license on recommendation of a state licensing agency. (*Gray v. Superior Court* (2005) 125 Cal.App.4th 629, 643.) It merely authorizes the relevant state agency to appear in criminal proceedings and provide information, recommendations or other assistance regarding conditions of probation. (§ 23.) It is Business and Professions Code section 7106 that allows a superior court to, in certain circumstances, "embrace" the suspension or revocation of a license as provided in chapter 9, division 3 of the Business and Professions Code. (Bus. & Prof. Code, § 7106.)

contends that the error was not harmless.  He further contends that if waiver applies, then he received ineffective assistance of counsel.

We conclude that the *Apprendi* error was harmless beyond a reasonable doubt. We therefore find that defense counsel's failure to object to such error was not reversible ineffective assistance of counsel.

## A.  THE TRIAL COURT ERRED BY FAILING TO SUBMIT THE ISSUE OF WHETHER DEFENDANT DIVERTED FUNDS "IN EXCESS OF $1,000" TO THE JURY

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.…"  (*Apprendi*, *supra*, 530 U.S. at p. 489.)  Under this rule, the "statutory maximum" is defined as the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. (*Blakely v. Washington* (2004) 542 U.S. 296, 303.)

The applicable version of section 484b, stated:

> "Any person who receives money for the purpose of obtaining or paying for services, labor, materials or equipment and willfully fails to apply such money for such purpose by either willfully failing to complete the improvements for which funds were provided or willfully failing to pay for services, labor, materials or equipment provided incident to such construction, and wrongfully diverts the funds to a use other than that for which the funds were received, shall be guilty of a public offense and shall be punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison, or in a county jail not exceeding one year, or by both that fine and that imprisonment *if the amount diverted is in excess of one thousand dollars ($1,000).  If the amount diverted is less than one thousand dollars ($1,000), the person shall be guilty of a misdemeanor.*"  (Italics added.)

That the amount of funds diverted was $1,000 or more is an element of felony diversion, but not misdemeanor diversion.  (§ 484b.)  Defendant was charged with *felony* diversion and the jury convicted him "as charged."  But, the court did not instruct the jury

14.

that they needed to make any finding regarding the amount of funds diverted, and the jury's verdict reflects no such finding.  Because the possibility of both imprisonment and a fine was only available if defendant diverted an amount "in excess of one thousand dollars," (§ 484b), the issue needed to be submitted to a jury.  (Cf. *Apprendi*, *supra*, 530 U.S. at p. 489.)  The failure to do so was error.  (Cf. *ibid*.)

### B. THE TRIAL COURT'S *APPRENDI* ERROR WAS HARMLESS

We consider whether an *Apprendi* error was harmless under the standard set forth in *Chapman*, *supra*, 386 U.S. 18.  (*People v. Davis* (2005) 36 Cal.4th 510, 564; *People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 327.)  That is, we determine whether the prosecution has proved beyond a reasonable doubt that the error did not contribute to the jury's verdict.  (*Sengpadychith*, *supra*, 26 Cal.4th at p. 320.)  "[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." (*Neder v. U.S.* (1999) 527 U.S. 1, 17.)

Defendant argues that he did contest the amount of funds diverted by "presenting evidence that he had used *all* of the funds provided to pay for labor and materials,…" (Italics added.)  But this evidence contested the *non-omitted* elements of the crime, which were not impacted by the *Apprendi* error.  That is, the evidence cited by defendant contested whether he diverted funds at all, not whether the diverted funds were in excess of $1,000.

Our harmless error analysis is element-specific.  "[W]hen jury instructions completely omit *an element* of a crime, and therefore deprive the jury of the opportunity to make a finding on *that element*, a conviction may be upheld under *Chapman* where there is no 'record ... evidence that could rationally lead to a contrary finding' *with respect to that element*.  [Citations.]"  (*People v. Davis*, *supra*, 36 Cal.4th at p. 564, italics

15.

added.) Here, that element was whether the diverted funds exceeded $1,000, not whether defendant diverted any funds at all.

The jury necessarily concluded that defendant diverted at least *some* funds, and this determination was not infected by *Apprendi* error. To establish prejudice from the *Apprendi* error itself, there would need to have been evidence that could rationally lead to a contrary finding *on the element affected by the Apprendi error* (i.e., whether the amount of diverted funds exceeded $1,000 or not). In other words, defendant needed to cite evidence that the amount of funds diverted, if any, was less than $1,000. (*People v. Davis*, *supra*, 36 Cal.4th at p. 564 ["when jury instructions completely omit an element … a conviction may be upheld … where there is no … 'evidence that could rationally lead to a contrary finding *with respect to that element….*' " (Italics added.)]) He cites no such evidence, and we find none in the record.

Defendant implicitly acknowledges the lack of the requisite type of evidence by arguing that had he "known that the precise amount of money diverted was an issue (as opposed to whether any money at all was diverted), then he *could have* presented expert testimony to counter the testimony of prosecution witnesses…, showing that if he diverted any money at all, then the sum diverted was not in excess of $1,000." (Italics added.) Defendant does not indicate *how* he should have been made aware that the amount of money diverted "was an issue."

But, the complaint expressly charged defendant with a *felony* violation of section 484b. The only distinction between felony and misdemeanor violations of then-section 484b was the amount of funds diverted. (§ 484b.) Thus the inclusion of the word "felony" in the complaint necessarily conveyed the prosecution's allegation that the amount of funds diverted was "in excess of $1,000." (See also *People v. Chait* (1945) 69 Cal.App.2d 503, 512-513 [rejecting claim that indictment was fatally flawed by failing to include value of property taken, which was necessary to determine whether offense was a felony or misdemeanor].) Even if the complaint had been ambiguous, defendant waived

16.

the objection by failing to demur to the accusatory pleading. (*People v. Heim* (1961) 196 Cal.App.2d 1, 5.)

Because we have found the error harmless under *Chapman*, "it necessarily follows the defense counsel's failure to object to that constitutional error did not represent ineffective assistance of counsel – for the simple reason the lawyer's mistake could not have affected the outcome." (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1012.)

## IV.

## UNANIMITY INSTRUCTION

## A. THE TRIAL COURT ERRED IN FAILING TO GIVE A UNANIMITY INSTRUCTION

When evidence adduced at trial suggests the defendant committed more than one distinct crime, the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal conduct. (*People v. Benavides* (2005) 35 Cal.4th 69, 101.) The parties agree that the trial court should have given a unanimity instruction here. At closing, the prosecutor argued that defendant committed multiple acts constituting violations of section 484b. Because there was no election by the prosecutor, the trial court was indeed required to give a unanimity instruction *sua sponte*. The failure to do so was error.

Next, we must determine whether that error was harmless. The failure to give a unanimity instruction violates a criminal defendant's constitutional right to a unanimous jury. (Cal. Const., art. 1, § 16; *People v. Castaneda* (1997) 55 Cal.App.4th 1067, 1071.) It also violates the right to due process under the federal constitution. (*People v. Wolfe* (2003) 114 Cal.App.4th 177, 186-188.) Therefore, the failure to give a unanimity instruction is reviewed under the stringent *Chapman* "harmless beyond a reasonable doubt" standard. (*People v. Milosavljevic* (2010) 183 Cal.App.4th 640, 647; *People v. Curry* (2007) 158 Cal.App.4th 766, 783; *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1536 [applying *Chapman* standard]; *People v. Metheney* (1984) 154 Cal.App.3d 555,

17.

563-565, fn. 5. Cf., *People v. Davis*, *supra*, 36 Cal.4th at p. 563 [Supreme Court applies "harmless beyond a reasonable doubt" test in dicta, without expressly deciding issue]. But, see *People v. Vargas* (2001) 91 Cal.App.4th 506, 562 [rejecting application of *Chapman* test in favor of *Watson*[6] test].)

The People argue the error was harmless, citing *People v. Thompson* (1995) 36 Cal.App.4th 843, 853. In *Thompson*, the court noted that "[w]here the record provides no rational basis, by way of argument or evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that defendant committed all acts if he committed any, the failure to give a unanimity instruction is harmless." (*Id*. at p. 853.) This is not such a case, as explained, *post*.

"The important question is whether there was anything in the record by way of evidence or argument to support discriminating between the two incidents such that the jury could find that appellant committed one … but not the other." (*People v. Brown* (1996) 42 Cal.App.4th 1493, 1502.) Here, the record does provide a rational basis, by way of argument or evidence, for the jury to distinguish between defendant's various acts.

The People argue that defendant did not offer differing defenses. She argues that appellant's defense to all of the acts "was that he ran out of funds to complete the project, the Johnsons paid him no additional funds, and the Johnsons reversed a payment to his account, preventing him from paying Calaveras Lumber for materials and from finishing the project." But the People are not describing a unitary defense, but rather several defenses that go to different elements of the crime. A closer analysis of the record shows that some of these defenses were specific to the particular acts cited by the prosecutor at closing.

---

[6] *People v. Watson* (1956) 46 Cal.2d 818.

18.

For example, some jurors may have found defendant guilty for his failure to pay Calaveras Lumber.[7] Defendant testified that Joel reversed a $3,500 credit card charge, effectively removing funds from defendant's account. This, according to defendant, prevented him from being able to pay Calaveras Lumber as he intended. In legal terms, the defense was that the element of "*willfully* failing to pay for services, labor … or equipment provided incident to such construction" was not satisfied. (§ 484b, italics added. See also § 7.)

Other jurors may have found defendant guilty because he failed to complete improvements for which the Johnsons had paid him.[8] Defendant testified that he eventually offered to do the work for the Johnsons free of charge. But, the Johnsons did not trust defendant by that point and rejected his offer. Thus, defendant's defense was that he did not "*willfully* fail[] to complete the improvements" for which he had been paid. (§ 484b, italics added.) See also § 7.)

We do note that there was considerable evidence contradicting these defenses. But, we may not consider the weight of the prosecution's evidence on harmless error review of an instructional omission that lowers the prosecution's burden of proof. (See *People v. Aranda* (2012) 55 Cal.4th 342, 368.) Failing to issue a unanimity instruction does precisely that. (*People v. Milosavljevic*, *supra*, 183 Cal.App.4th 640; *People v. Smith* (2005) 132 Cal.App.4th 1537, 1545.)

---

[7] "Any person who receives money for the purpose of obtaining or paying for services … materials or equipment and willfully fails to apply such money for such purpose by … *willfully failing to pay for services, labor, … * or equipment provided incident to such construction, and wrongfully diverts the funds to a use other than that for which the funds were received, shall be guilty .…" (§ 484b, italics added.)

[8] "Any person who receives money for the purpose of obtaining or paying for services, labor, materials or equipment *and willfully fails to apply such money for such purpose* by … willfully failing to complete the improvements for which funds were provided … and wrongfully diverts the funds to a use other than that for which the funds were received, shall be guilty .…" (§ 484b, italics added.)

" '[W]e cannot affirm a non-unanimous verdict simply because the evidence is so overwhelming that the jury surely would have been unanimous had it been properly instructed on unanimity.' " (*U.S. v. Russell* (3d. Cir. 1998) 134 F.3d 171, 181, quoting *U.S. v. Edmonds* (3d Cir. 1996) 80 F.3d 810, 824.)

Because there were different defenses offered to the various acts, there is a rational basis for the jury to distinguish between them. (Cf. *People v. Thompson*, *supra*, 36 Cal.App.4th at p. 854 [different defenses give jury rational basis for distinguishing acts].) And because there was a rational basis for distinguishing the acts, we cannot hypothesize whether the jury credited those distinctions or collectively agreed on the act constituting the crime. (See *U.S. v. Beros* (3rd Cir. 1987) 833 F.2d 455, 461.) "[W]e cannot say beyond a reasonable doubt that each juror agreed on the particular criminal act that formed the basis for the verdict." (*People v. Melhado*, *supra*, 60 Cal.App.4th at p. 1536.)

## V.

### THE ORDER REVOKING DEFENDANT'S CONTRACTORS LICENSE MUST BE REVERSED ALONG WITH THE CONVICTION

The trial court's revocation of defendant's contractor's license was based on his conviction. (See Bus. & Prof. Code, §§ 7090, 7123.) Because we reverse the conviction, we also reverse the order revoking defendant's contractor's license in its entirety.

### DISPOSITION

The judgment and the order revoking defendant's license are reversed in their entirety. The matter is remanded for possible retrial, and possible rehearing under Business and Professions Code section 7106.

_____
Poochigian, J.

WE CONCUR:


_____
Cornell, Acting P.J.


_____
Gomes, J.

21.